IN THE MATTER OF: JOANIE STUMBO, STEVEN STUMBO, SCOTT STUMBO, UNKNOWN STUMBO

No. 321A01

(Filed 16 July 2003)

**Parent and Child—juvenile neglect—obstruction of investigation**

The trial court's order based upon a petition filed by the Department of Social Services (DSS) under N.C.G.S. § 7B-303 charging the parents with interference with or obstruction of an investigation is reversed because the investigative mandate of N.C.G.S. § 7B-302 regarding the abuse, neglect, or dependency of a juvenile was not properly invoked when: (1) before any investigation is initiated or interference with any such investigation ensues, the proper inquiry that must be made by DSS is whether an investigation is mandated based upon the first report or multiple reports that show a pattern of neglect; (2) there was no testimony by the investigator for DSS at the hearing and no written report by DSS regarding whether the anonymous caller's allegations rose to a level sufficient to constitute a report of neglect and require the statutorily mandated investigation; and (3) the factually incomplete circumstances of the instant case of a single report by an anonymous caller of an unsupervised, naked two-year-old child in the driveway of a house does not trigger the investigative requirements of N.C.G.S. § 7B-302.

Justice MARTIN concurring.

Chief Justice LAKE and Justice BRADY joining in concurring opinion.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 143 N.C. App. 375, 547 S.E.2d 451 (2001), affirming an order entered 25 January 2000 by Judge Anna F. Foster in District Court, Cleveland County. On 8 November 2001, the Supreme Court retained respondents' notice of appeal as to a substantial constitutional question pursuant to N.C.G.S. § 7A-30(1). Heard in the Supreme Court 11 February 2002.

*John D. Church; and Yelton, Farfour, McCartney & Lutz, by Leslie Farfour Jr., for petitioner-appellee Cleveland County Department of Social Services.*

IN RE STUMBO

[357 N.C. 279 (2003)]

*Stam, Fordham & Danchi, P.A., by Paul Stam; and Home School Legal Defense Association, by Michael P. Farris, pro hac vice; James R. Mason, pro hac vice; and Scott W. Somerville, pro hac vice, for respondent-appellants James and Mary Stumbo.*

*Smith Helms Mulliss & Moore, LLP, by Neil A. Riemann; and Seth H. Jaffe, on behalf of the American Civil Liberties Union of North Carolina Legal Foundation, amicus curiae.*

*Lewis, Goldberg & Ball, P.C., by Michael L. Goldberg, pro hac vice, and Michael D. Hutchinson, pro hac vice; National Association of Social Workers, by Carolyn I. Polowy, General Counsel, pro hac vice; and Council for Children, Inc., by Brett Loftis, on behalf of the National Association of Social Workers and the National Association of Social Workers, North Carolina Chapter, amici curiae.*

*Roy Cooper, Attorney General, by R. Kirk Randleman, Assistant Attorney General, on behalf of the State of North Carolina, amicus curiae.*

ORR, Justice.

This case arises out of an anonymous call to an unnamed case-worker in the Cleveland County Department of Social Services (CCDSS) during which the caller alleged that he or she had seen an unsupervised two-year-old child, naked in the driveway of a house. This information, along with the location of the home, was passed along to Tasha Lowery, an investigator with the CCDSS.

Approximately two hours later, Ms. Lowery investigated the anonymous report and was rebuffed by first the mother and then the father, Mary Ann and James Stumbo, in her attempt to talk in private with the child in question and with the child's siblings. As a result, CCDSS filed a "Petition to Prohibit Interference with or Obstruction of Child Protective Services Investigation" in the District Court, Cleveland County, pursuant to N.C.G.S. § 7B-303.

On 27 September 1999, a hearing was held on the petition, at which time both parents of the child and Ms. Lowery testified. The district court judge focused her inquiry exclusively on whether the parents had interfered with the investigation and concluded that the "parents of the minor children named in the petition obstructed or interfered with this investigation by refusing to allow Tasha Lowery as a representative of the Director of Social Services for Cleveland

**IN RE STUMBO**

[357 N.C. 279 (2003)]

County[] to observe or interview the Juveniles in private without lawful excuse." The court then ordered the parents "to not obstruct, interfere with the investigation as set forth in [N.C.G.S. §] 7B-303(a) and 7B-303(b)." The parents appealed to the Court of Appeals, which, in a divided decision, affirmed the trial court. The parents filed notice of appeal with this Court based upon the dissent and also based upon a constitutional question.

This Court is called upon to resolve and clarify the scope and authority under the pertinent statutes of a department of social services (DSS) to pursue this matter based upon the facts established by the record. Throughout the litigation of this case, the parents have cloaked their argument in the context of Fourth Amendment constitutional grounds.[1] As we have often noted, "the courts of this State will avoid constitutional questions, even if properly presented, where a case may be resolved on other grounds." *Anderson v. Assimos*, 356 N.C. 415, 416, 572 S.E.2d 101, 102 (2002). This is just such a case.

In examining the record before this Court, we find no direct evidence or record of the specific contents of the anonymous call made to the CCDSS. The only evidence is Ms. Lowery's testimony at the hearing as to what an unnamed caseworker told her:

Q. Now, directing your attention to the time or near the time that this petition for non-interference was taken out, did you have occasion, Ms. Lowery, to receive a report involving any of the children that you have now identified in your petition for a non-interference order as Jonie Stumbo, . . .?

A. Yes.

---

1. We note that the Seventh Circuit Court of Appeals recently held that it was unconstitutional on Fourth Amendment grounds when Child Welfare employees interviewed a minor child at a private school "without a warrant or court order, probable cause, consent or exigent circumstances." *Doe v. Heck*, 327 F.3d 492, —— (7th Cir. 2003). In *Doe v. Heck*, the Bureau of Milwaukee Child Welfare received a report that a private school used corporal punishment as a form of discipline. The caseworkers went to the school and removed, without a warrant, court order, parental notification or consent, an eleven-year-old child from his classroom to interview him about the school's disciplinary procedures *Id.* The Seventh Circuit ultimately held that the caseworkers' investigation constituted a search because they "went to the school for the specific purpose of gathering information, an activity that most certainly constitutes a search under the Fourth Amendment." *Id.* at ——. The Seventh Circuit further held that the eleven-year-old was seized "within the meaning of the Fourth Amendment because no reasonable child would have believed he was free to leave." *Id.* at ——. Finally, the court held that the parents manifested a reasonable expectation of privacy by enrolling him in the private school and entrusting the child to school officials. *Id.* at ——.

**IN RE STUMBO**

[357 N.C. 279 (2003)]

Q. When was that?

A. September the 9th, 1999.

Q. What were you doing on September the 9th, 1999 when you received a report involving these children or how did you become involved with these children?

A. I was on what we call the emergency schedule, so I respond to any kind of immediate calls. I was on my way to follow up on additional report for my caseload when I was paged and given the information by a new caseworker.

Q. And what information did you receive?

A. The information I received that someone had saw a two-year old naked child in the driveway unsupervised.

Q. And did they give you a location or a general area where the child had been observed naked and unsupervised in the yard?

A. Yes.

Q. And what location were you given by the intake—

A. The indicator was on Wright Road in Kings Mountain. It was the last case on the right before you get to the subdivision on the left.

Q. The last case or the last house?

A. Last house.

The record does not reflect, nor did the testimony at the hearing provide, any further information about the facts of the incident that precipitated this litigation. There is no information either in the record or in the transcript of the hearing as to how long the child was outside unsupervised; the character of the surrounding area; or whether the child had ever been outside, naked and unsupervised before. Upon being called as a witness, James Stumbo attempted to explain what had happened, but the trial court sustained opposing counsel's objection to Mr. Stumbo's testimony. The trial court instructed Mr. Stumbo to confine his testimony to events that transpired at the time Ms. Lowery arrived at his home. All further evidence and the record before us relates solely to the effort by Ms. Lowery to interview the Stumbos' four children in private and the Stumbos' refusal to allow her to do so. Thus, without ever determining whether there was sufficient evidence of "neglect" to trigger the

investigative requirements of N.C.G.S. § 7B-302, this case proceeded to a statutorily mandated investigation and legal measures to prohibit the parents' interference with an investigation by the CCDSS. The focus of all parties was on the Fourth Amendment right of the Stumbos to refuse to let Ms. Lowery in their house and/or to interview the children in private.

As explained in the case of *In re Helms*, "[t]he determination of neglect requires the application of the legal principles set forth in N.C. Gen. Stat. § 7A-517(21) [now N.C.G.S. § 7B-101(15)] and is therefore a conclusion of law." *In re Helms*, 127 N.C. App. 505, 510, 491 S.E.2d 672, 675-76 (1997). Thus, it is incumbent on the Court to determine whether, based on the evidence of record, the conduct complained of, if true, constituted neglect as envisioned by the General Assembly and as interpreted by the case law of this jurisdiction.

Before reviewing applicable case law on this question, we note that not every act of negligence on the part of parents or other care givers constitutes "neglect" under the law and results in a "neglected juvenile." Such a holding would subject every misstep by a care giver to the full impact of subchapter I of chapter 7B of the North Carolina General Statutes, resulting in mandatory investigations, N.C.G.S. § 7B-302 (2001); and the potential for petitions for removal of the child or children from their family for custodial purposes, N.C.G.S. ch. 7B, subch. I, art. 5 (2001); and/or ultimate termination of parental rights, N.C.G.S. ch. 7B, subch. I, art. 11 (2001).

A "neglected juvenile" is defined in part as one "who does not receive proper care, supervision, or discipline from the juvenile's parent . . . or who lives in an environment injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15) (2001). In order to adjudicate a juvenile neglected, our courts have additionally "required that there be some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure to provide 'proper care, supervision, or discipline.' " *In re Safriet*, 112 N.C. App. 747, 752, 436 S.E.2d 898, 901-02 (1993) (quoting former N.C.G.S. § 7A-517(21) (1989)), *quoted in Helms*, 127 N.C. App. at 511, 491 S.E.2d at 676.

Our review of the numerous cases where "neglect" or a "neglected juvenile" has been found shows that the conduct at issue constituted either severe or dangerous conduct or a pattern of conduct either causing injury or potentially causing injury to the juvenile. For example, in *Powers*, the Court of Appeals ultimately adjudicated

four children neglected based on clear and convincing evidence of the mother's severe abuse of alcohol. *Powers v. Powers*, 130 N.C. App. 37, 502 S.E.2d 398, *disc. rev. denied*, 349 N.C. 530, 526 S.E.2d 180 (1998). The county DSS had received twenty-four reports about the care of the Powers children. *Id.* at 39, 502 S.E.2d at 400. DSS substantiated seven reports against the mother "based on her lack of supervision, alcoholism and emotional abuse or neglect." *Id.* During DSS' involvement, the mother was cited for driving while impaired on at least two occasions while her minor children were passengers. *Id.* at 39, 42, 502 S.E.2d at 399, 401. DSS reports showed that while at home the mother became substantially intoxicated and was unable to care for her younger children and that her alcohol abuse contributed to the emotional problems of her children. *Id.* at 43-44, 502 S.E.2d at 402.

In another child-neglect case, an elementary school principal reported to the county DSS that a five-year-old came to school with a bruise on her face and complained that her mother had been "digging into" her vagina with a washcloth during baths. *In re Thompson*, 64 N.C. App. 95, 96, 306 S.E.2d 792, 792 (1983). The trial court found as fact that the mother had "struck her child with a belt and, on at least three occasions while bathing the child, inserted her finger or a washcloth into the child's vagina and washed with sufficient force to cause the child to bleed." *Id.* at 99, 306 S.E.2d at 794. The mother was instructed to get counseling for the child, as well as for herself, both of which the mother failed to do. *Id.* at 100, 306 S.E.2d at 795. Although the trial court dismissed the petition for protective services, on appeal, the Court of Appeals, based on the clear and convincing evidence of neglect, vacated the order and remanded the case for further proceedings. *Id.* at 101, 306 S.E.2d at 796.

In the case of *In re Bell*, the county DSS first became involved when it received a report stating that four children under the age of six years had been left alone overnight. *In re Bell*, 107 N.C. App. 566, 421 S.E.2d 590, *appeal dismissed*, 333 N.C. 168, 426 S.E.2d 699 (1992). Ultimately, the trial court adjudicated the children in *Bell* neglected because DSS found that the parent did not keep adequate food in the house, that two children were not immunized against childhood diseases, and that the six-month-old baby had never been seen by a doctor. *Id.* at 567-68, 421 S.E.2d at 591.

In the aforementioned cases, the facts of the initial reports were "reports of neglect" as required by N.C.G.S. § 7B-302. In *Powers*, DSS received twenty-four reports that children were in harm's way

IN RE STUMBO

[357 N.C. 279 (2003)]

because of their mother's alcohol abuse, and thereby served to establish a pattern of conduct injurious to the children's welfare. *Powers*, 130 N.C. App. at 39-47, 502 S.E.2d at 400-04. In *Thompson*, although DSS received only one report, the report was an allegation of a serious sexual offense. *Thompson*, 64 N.C. App. at 96-104, 306 S.E.2d at 792-96. Finally, in *Bell*, the report that four children under the age of six were left alone overnight served to establish neglect of a serious and dangerous nature. *Bell*, 107 N.C. App. at 567-71, 421 S.E.2d at 591-93. The factually incomplete circumstances of the instant case (the one time citing of an unsupervised, naked two-year-old in her driveway) do not approximate those factual circumstances of the cases above; thus, we must conclude, as a matter of law, that the evidence of record does not constitute a report of "neglect."

Once a county DSS receives "a report of abuse, neglect, or dependency," the investigative mandates of N.C.G.S. § 7B-302 follow:

> When a report of abuse, neglect, or dependency is received, the director of the department of social services shall make a prompt and thorough investigation in order to ascertain the facts of the case, the extent of the abuse or neglect, and the risk of harm to the juvenile, in order to determine whether protective services should be provided or the complaint filed as a petition.

N.C.G.S. § 7B-302(a). It is this statute that sets off a chain of statutory and regulatory actions by the DSS. Once an investigation ensues, anyone who interferes with that investigation may be summoned to defend his or her actions and ultimately may be ordered by the trial court to cease from obstructing or interfering with the investigation. N.C.G.S. § 7B-303(a) (2001). Moreover, a non-interference order may be enforced by civil or criminal contempt. N.C.G.S. § 7B-303(f). In part, "interference" means "refusing to allow the director to have personal access to the juvenile, [and] refusing to allow the director to observe or interview the juvenile in private." N.C.G.S. § 7B-303(b). However, before any investigation is initiated or interference with any such investigation ensues, the proper inquiry that must be made by DSS is whether an investigation is mandated based upon the first report or multiple reports that show a pattern of neglect. Having commenced a N.C.G.S. § 7B-303 hearing, however, it is incumbent on the trial court to first ascertain whether a report of abuse, neglect, or dependency triggering the statutory mandates has been made. To the extent that the trial court in this case, as affirmed by the Court of Appeals majority concluded otherwise, that decision is in error.

One of the initial responsibilities of any department of social services is to screen a report for an ultimate determination of whether to investigate further. "Protective services shall include the . . . screening of complaints . . . ." N.C.G.S. § 7B-300 (2001). Administrative rule 10 NCAC 41I .0304, titled "Receiving Information: Initiating Prompt Investigations of Reports," governs the initial screening process and the determination of whether a statutorily mandated investigation is necessary. Though there is no regulation explaining to caseworkers how to screen initial reports, there are policies instructing them how to dismiss reports of abuse, neglect, or dependency when the factual circumstances do not warrant an investigation:

> (g) The county director must have an internal two-level review, including at a minimum the worker and the worker's supervisor, *prior to making a decision that information received does not constitute a report of abuse, neglect, or dependency.*

> (h) The county director must establish a process by which the person providing this information may obtain a review of the agency's decision *not* to accept the information as a report of abuse, neglect, or dependency.

10 NCAC 41I .0304(g), (h) (June 2002) (emphasis added). Thus, this regulation demonstrates that not all reports constitute "abuse, neglect, or dependency" and that the department must screen out those reports that do not merit a statutorily mandated investigation. In the case at bar, there was no testimony by Ms. Lowery at the hearing and no written report by CCDSS regarding whether the anonymous caller's allegations rose to a level sufficient to constitute a report of neglect and require the statutorily mandated investigation.

While acknowledging the extraordinary importance of protecting children from abuse, neglect, or dependency by prompt and thorough investigations, we likewise acknowledge the limits within which governmental agencies may interfere with or intervene in the parent-child relationship. "[S]o long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel v. Granville*, 530 U.S. 57, 68-69, 147 L. Ed. 2d 49, 58 (2000). Thus, under the specific facts of this

case, we conclude as a matter of law that the anonymous report was insufficient to invoke the extensive power and authority permitted by the General Assembly to the county departments of social services. The pointed question in this case, then, is whether an anonymous call reporting a naked child, two years of age, unsupervised in a driveway, in and of itself constitutes "a report of abuse, neglect, or dependency." We conclude that, standing alone, it does not.

The Juvenile Code is codified in chapter 7B of the North Carolina General Statutes. Subchapter I of that chapter deals with "Abuse, Neglect, Dependency." One of the stated purposes of the Juvenile Code is "[t]o provide for services for the protection of juveniles by means that respect both the right to family autonomy and the juveniles' needs for safety, continuity, and permanence." N.C.G.S. § 7B-100(3) (2001). Further, a "neglected juvenile" is defined as:

> A juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law. In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home where another juvenile has died as a result of suspected abuse or neglect or lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home.

N.C.G.S. § 7B-101(15).

It is obvious from this definition and the cases applying it that the circumstances constituting neglect involve serious and substantial allegations. "Neglect" is further linked with "abuse" and "dependency," thereby reinforcing the legislative conclusion that these are conditions that pose a serious threat to a juvenile's welfare. In fact, one of the specific grounds for terminating parental rights under N.C.G.S. § 7B-1111(a) is that "[t]he parent has . . . *neglected* the juvenile." N.C.G.S. § 7B-1111(a)(1) (2001) (emphasis added). Furthermore, under that statute, "[t]he juvenile shall be deemed to be . . . neglected if the court finds the juvenile to be . . . a neglected juvenile within the meaning of G.S. 7B-101." *Id.*

The statutes relied upon by CCDSS—N.C.G.S. § 7B-302, "Investigation by director; access to confidential information;

notification of person making the report," and N.C.G.S. § 7B-303, "Interference with investigation"—are predicated upon a report alleging abuse, neglect, dependency, or death caused by maltreatment. N.C.G.S. § 7B-301 (2001). Thus, before the mandated statutory requirement for an investigation under N.C.G.S. § 7B-302 is met, a report of neglect sufficient to meet the definition of N.C.G.S. § 7B-101(15) must be made. And, upon gathering sufficient evidence of neglect and substantiating a report of neglect, parents could ultimately have their parental rights terminated.

The conclusion we reach under these facts in no way endangers the ability of departments of social services to protect juveniles. In this case, a phone call to the parent by CCDSS (or by the anonymous caller) alerting the parent to the child's unsupervised presence outside potentially could have resolved the issue. Certainly, a call to the parents would have been a far more logical step toward protecting the child than the delay, unavoidable or otherwise, of approximately two hours to visit the home. Had there been a complaint of a pattern of lack of supervision of the child or other credible evidence that indicated a serious failing on the part of the parents to look after the child, then such conduct could rise to the level triggering the investigative mandate of N.C.G.S. § 7B-302. However, a single report of a naked, unsupervised two-year-old in the driveway of her home does not trigger the investigative requirements of N.C.G.S. § 7B-302.

By enacting chapter 7B, subchapter I, the General Assembly has provided a mandate to departments of social services in addressing reports of abuse, neglect, and dependency. As such, the departments are not precluded or prevented from inquiring or investigating reports that are of concern but do not, upon the information reported, rise to the level mandated by our laws for abuse, neglect, and dependency. Departments of social services may, and in many cases should, make inquiry but are not vested at that point with the full range of powers and duties governed by chapter 7B. Nor are the parents or care givers subject to those same powers and punitive measures. Subsequent inquiry may well prove otherwise, and the evidence may ultimately show grounds of abuse, neglect, or dependency sufficient to trigger the statutory investigative mandates. Such is not the case here.

On this record, we have a report of a circumstance that probably happens repeatedly across our state, where a toddler slips out of a house without the awareness of the parent or care giver—no matter how conscientious or diligent the parent or care giver might be. While

IN RE STUMBO

[357 N.C. 279 (2003)]

no one wants that to happen, such a lapse does not in and of itself constitute "neglect" under N.C.G.S. § 7B-101.

Having concluded that the investigative mandate of N.C.G.S. § 7B-302 was not properly invoked, it follows that the trial court's order based upon the petition filed pursuant to N.C.G.S. § 7B-303 charging the parents with interference with or obstruction of an investigation must fail. Therefore, the decision of the Court of Appeals affirming the order of the trial court must be reversed. Accordingly, we reverse the decision of the Court of Appeals and remand this case to that court for further remand to the District Court, Cleveland County, for entry of an order consistent with this opinion.

REVERSED AND REMANDED.

Justice MARTIN concurring.

I agree with the majority's conclusion that the trial court erred by granting a noninterference order pursuant to N.C.G.S. § 7B-303. The instant case presents issues of first impression, implicates federal and state constitutional rights, and raises matters of vital importance to the public. To provide guidance when noninterference orders are sought under section 7B-303, I respectfully concur by separate opinion.

The questions presented by the respondent-appellants are:

I.   In a case brought pursuant to N.C. Gen. Stat. § 7B-303, must the government prove that there are reasonable grounds for suspecting that a person has abused or neglected a child?

II.  Does the investigation mandated by N.C. Gen. Stat. § 7B-302 and implemented by N.C. Admin. Code tit. 10 § 411.0305 constitute a "search" for constitutional purposes, as Judge Greene argues in his dissent?

III. Is the court-ordered separation of a parent and child for the purpose of unrestricted personal interrogation of the child a "seizure" within the meaning of the Fourth Amendment to the United States Constitution?

The parties, petitioner Cleveland County Department of Social Services and respondents James and Mary Ann Stumbo, have thoroughly briefed and argued these legal questions. Amicus curiae briefs

addressing the important constitutional questions raised by the instant case have been filed by the American Civil Liberties Union of North Carolina Legal Foundation, Inc., the National Association of Social Workers and its North Carolina Chapter, and the State of North Carolina.

I.

It is beyond question that we will consider a constitutional question when "strong considerations of public necessity appear." *M. H. Rhodes, Inc. v. City of Raleigh,* 217 N.C. 627, 630, 9 S.E.2d 389, 391 (1940). The procedures for investigating child abuse allegations in North Carolina are a matter of critical public interest. According to the State, DSS received 102,158 reports of alleged abuse, neglect, and dependency during 2001. It is a matter of immense public importance that DSS be able to fulfill its vital mission while simultaneously ensuring that statutory procedures for DSS investigations comport with the Constitution. This case also presents a legal question of first impression—a definitive pronouncement by this Court would provide clarification for child protection workers and for citizens who interact with government actors executing routine investigatory protocols.

In its opinion, the majority analyzes the term "neglect" as used in N.C.G.S. § 7B-302. In my view, the cases cited by the majority, where a court found neglect after a comprehensive investigation, do not provide adequate guidance as to what does and does not "trigger" the investigative requirements of N.C.G.S. § 7B-302. Indeed, it is not desirable, or perhaps even possible, to attempt a comprehensive identification of the various scenarios that might warrant an initial investigation. Child abuse can be difficult to detect, and DSS faces an infinite variety of circumstances when forming a preliminary assessment as to whether a report of abuse may ultimately be substantiated. The application of DSS' expertise and discretion is therefore crucial in the initial stages of investigation.

Perhaps most important, this case implicates well-established and closely guarded constitutional rights. *See Corum v. University of North Carolina,* 330 N.C. 761, 783, 413 S.E.2d 276, 290 (1992) (stating that the judiciary's "obligation to protect the fundamental rights of individuals is as old as the State"), *cert. denied,* 506 U.S. 985, 121 L. Ed. 2d 431 (1992). The majority's analysis delays needed resolution of the constitutional questions briefed and argued by the parties. *See Rice v. Rigsby,* 259 N.C. 506, 511-12, 131 S.E.2d 469, 472-73 (1963)

**IN RE STUMBO**

[357 N.C. 279 (2003)]

(addressing a constitutional issue of "vast public importance," despite procedural default, where the parties had fully briefed and argued the issue). Put simply, the question of whether the State may lawfully enter a private residence as part of an investigatory protocol in the absence of any fact-specific justification is left unanswered.

As recognized by the majority, the Juvenile Code mandates that directors of county departments of social services "make a prompt and thorough investigation" when a report of child abuse, neglect, or dependency is received. N.C.G.S. § 7B-302(a) (2001). The purpose of the investigation is "to ascertain the facts of the case, the extent of the abuse or neglect, and the risk of harm to the juvenile, in order to determine whether protective services should be provided or the complaint filed as a petition." *Id.* The statute further provides that "the investigation and evaluation shall include a visit to the place where the juvenile resides." *Id.*

The North Carolina Administrative Code sets out the procedures for directors to follow in carrying out the mandate of chapter 7B of the General Statutes. 10 NCAC 41I .0101 (June 2002). Once prompted by a report of neglect, abuse, or dependency, directors "shall make a thorough investigation to assess . . . whether the specific environment in which the child or children is found meets the child's or children's need for care and protection." 10 NCAC 41I .0305(a)(1) (June 2002).

When conducting the evaluation required by section 7B-302 and the corresponding administrative regulations, no person is to obstruct or interfere with a director's "personal access to the juvenile" or refuse to allow a director to "observe or interview the juvenile in private." N.C.G.S. § 7B-303(b) (2001). To ensure that directors are provided access to conduct the investigation, they may seek a "noninterference order." N.C.G.S. § 7B-303(a). In the absence of a "lawful excuse, . . . the court may order the respondent to cease such obstruction or interference." N.C.G.S. § 7B-303(c).

The noninterference order envisioned by section 7B-303 is enforceable by civil or criminal contempt. N.C.G.S. § 7B-303(f). Thus, once such an order has been issued, a caregiver is faced with two options: (1) she can consent to the requests of the director, or (2) she can assert her constitutional right to freedom from impermissible searches and seizures as a "lawful excuse" for noncompliance and risk contempt of court. Such a statutory scheme necessarily implicates the Fourth Amendment to the United States

Constitution and the parallel guarantees of Article I, Section 20 of the North Carolina Constitution.

The Juvenile Code, chapter 7B of the General Statutes, appears to recognize the important constitutional issues at stake in emergency child protection situations, yet includes no textual provision to ensure compliance with constitutional guarantees in non-emergency or routine investigatory situations. According to N.C.G.S. § 7B-303(d), there must be "probable cause to believe . . . the juvenile is at risk of immediate harm" for issuance of an *ex parte* emergency order. As recognized by Judge Greene in his dissenting opinion at the Court of Appeals, this provision was "an obvious recognition by our Legislature of the need to protect the privacy interest of the person to be investigated in the face of a report of abuse/neglect of a child." *Stumbo*, 143 N.C. App. at 386 n.5, 547 S.E.2d at 458 n.5 (Greene, J., dissenting). If the government must show probable cause as a prerequisite to removal of a child in an emergency, it would seem imperative for this Court to consider the constitutional standard applicable to home entry and nonconsensual interviews during non-emergency investigatory protocols conducted by the government.

It is important to resolve this issue in light of the statutory obligation of directors to "make an immediate oral and subsequent written report" of their findings of abuse or neglect to the district attorney and the "appropriate local law enforcement agency." N.C.G.S. § 7B-307(a) (2001). Significantly, the district attorney, after receipt of this report, is required to initiate a criminal investigation and determine whether criminal prosecution of the parent or other caregiver is appropriate. *Id.* In light of these considerations, this Court should determine whether our child protection statutes may be construed in a constitutional manner. *See In re Arthur*, 291 N.C. 640, 642, 231 S.E.2d 614, 616 (1977) (discussing a court's duty to construe a statute in a constitutional manner, if possible).

Thus, the central issue in this case is whether, when conducting a routine, non-emergency investigation, the Fourth Amendment to the United States Constitution and Article I, Section 20 of the North Carolina Constitution allow a director to secure a noninterference order without particularized allegations of abuse or neglect supported by corroborative evidence.

At the outset, it should be noted that the Juvenile Code places the burden of proof on the government, the party seeking the noninterference order. N.C.G.S. § 7B-303(c). Moreover, the trial court is

**IN RE STUMBO**

[357 N.C. 279 (2003)]

required to utilize a heightened burden of proof for such proceedings. The trial court must find by "clear, cogent, and convincing evidence that the respondent, *without lawful excuse*, has obstructed or interfered with an investigation required by G.S. § 7B-302." *Id.* (emphasis added).

Against this backdrop, the petition in the present case alleged only that DSS "received a report alleging neglect of the above named children." The petition did not mention the nature of the actual allegations that were reported. As noted by the majority, the trial court did not allow evidence regarding the relevant circumstances and events surrounding the reported allegation. Instead, the trial court determined that such evidence did not relate to whether the Stumbos had a "lawful excuse" for refusing to cooperate with the investigation and that the purpose of the hearing was to determine only whether there was any interference in the investigation regardless of (1) whether the initiation of the investigation was justified, or (2) whether any of the Stumbos' constitutional rights were implicated by the government's investigatory protocol.

## II.

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. This right is applied to the states through the Fourteenth Amendment and has "been applied to the conduct of government officials in various civil activities." *O'Connor v. Ortega*, 480 U.S. 709, 714, 94 L. Ed. 2d 714, 721 (1987) (plurality opinion). A similar right is afforded by the North Carolina Constitution: "General warrants, whereby any officer or other person may be commanded to search suspected places without evidence of the act committed, or to seize any person or persons not named, whose offense is not particularly described and supported by evidence, are dangerous to liberty and shall not be granted." N.C. Const. art. I, § 20. "[A] governmental search and seizure of private property unaccompanied by prior judicial approval in the form of a warrant is *per se* unreasonable unless the search falls within a well-delineated exception to the warrant requirement involving exigent circumstances." *State v. Cooke*, 306 N.C. 132, 135, 291 S.E.2d 618, 620 (1982). We have called this tenet a " 'basic principle of Fourth Amendment law.' " *State v. Smith*, 346 N.C. 794, 798, 488 S.E.2d 210, 213 (1997) (quoting *Payton v. New York*, 445 U.S. 573, 586, 63 L. Ed. 2d 639, 651 (1980)). Of the many privileges of living in a free society, few are val-

ued more than the constitutional right to be free from unreasonable warrantless searches in one's private residence.

I pause to observe that the trial court apparently concluded DSS was not a government actor for purposes of the Fourth Amendment. This is legally incorrect. The United States Supreme Court has "never limited the Amendment's prohibition on unreasonable searches and seizures to operations conducted by the police. Rather, the Court has long spoken of the Fourth Amendment's strictures as restraints imposed upon 'governmental action'—that is, 'upon the activities of *sovereign authority.*' " *New Jersey v. T.L.O.*, 469 U.S. 325, 335, 83 L. Ed. 2d 720, 730 (1985) (quoting *Burdeau v. McDowell*, 256 U.S. 465, 475, 65 L. Ed. 1048, 1051 (1921)) (emphasis added). Federal courts which have considered this question arising under the United States Constitution have concluded, either explicitly or implicitly, that constitutional limitations apply to government officials who investigate child abuse. *See Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000); *Tenenbaum v. Williams*, 193 F.3d 581, 602 n.14 (2d Cir. 1999), *cert. denied*, 529 U.S. 1098, 146 L. Ed. 2d 776 (2000); *Calabretta v. Floyd*, 189 F.3d 808, 813-14 (9th Cir. 1999); *Franz v. Lytle*, 997 F.2d 784, 788-90 (10th Cir. 1993); *Wildauer v. Frederick Cty.*, 993 F.2d 369, 372 (4th Cir. 1993); *Good v. Dauphin Cty. Social Servs. for Children & Youth*, 891 F.2d 1087, 1092-97 (3d Cir. 1989); *Robison v. Via*, 821 F.2d 913, 919-20 (2d Cir. 1987); *White v. Pierce Cty.*, 797 F.2d 812, 815 (9th Cir. 1986). State appellate courts have reached similar conclusions. *See, e.g., H.R. v. State Dept. of Human Res.*, 612 So.2d 477, 479 (Ala. Civ. App. 1992); *Germaine v. State*, 718 N.E.2d 1125, 1130-31 (Ind. Ct. App.), *transfer denied*, 726 N.E.2d 316 (Ind. 1999); *C.R. v. State*, 937 P.2d 1037, 1040-41 (Utah Ct. App. 1997), *aff'd*, 982 P.2d 73 (Utah 1999).

Judicial recognition that DSS and its employees are government actors is simply an acknowledgment that "[t]he Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself *and all of its creatures.*" *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637, 87 L. Ed. 1628, 1637 (1943) (emphasis added). DSS is engaged in the noble duty of protecting children: "There is no more worthy object of the public's concern." *Wyman v. James*, 400 U.S. 309, 318, 27 L. Ed. 2d 408, 414 (1971). Despite the beneficial public purpose underlying this and perhaps every other governmental initiative in a free society, it is nonetheless a truism that the Bill of Rights exists "to protect unpopular individuals from retaliation . . . at the hand of an intolerant society." *McIntyre v. Ohio*

*Elections Comm'n*, 514 U.S. 334, 357, 131 L. Ed. 2d 426, 446 (1995). Unfounded allegations of child abuse unfairly stigmatize individuals, clearly making them "unpopular" within their local community. Thus, it is critical that the government bring forward particularized allegations supported by at least some evidence before carrying out the more intrusive aspects of its investigatory protocol.

The government argues that requiring a warrant prior to entering a private residence would be unduly burdensome and would frustrate the child abuse investigatory process. The United States Supreme Court has recognized that requiring a state actor, in certain situations, to procure a warrant prior to a search would unduly burden the government in light of the special circumstances presented. For instance, the United States Supreme Court has opined that a teacher need not obtain a warrant before searching a student because requiring a warrant "would unduly interfere with the maintenance of the swift and informal disciplinary procedures needed in the schools." *T.L.O.*, 469 U.S. at 340, 83 L. Ed. 2d at 733. The Supreme Court has reached a similar conclusion when evaluating the warrant requirement's applicability to other special circumstances. *See Griffin v. Wisconsin*, 483 U.S. 868, 880, 97 L. Ed. 2d 709, 721-22 (1987) (warrantless searches of probationer's home allowed when there were reasonable grounds to believe the search would uncover evidence of wrongdoing, because the supervisory arrangement of probation justified a departure from the traditional requirements of a warrant and probable cause); *O'Connor*, 480 U.S. at 724-25, 94 L. Ed. 2d at 727-28 (public employer hospital's search of doctor's desk reasonable without a warrant because of the special need to ensure that public agencies operate in an effective and efficient manner); *see also Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 664-65, 132 L. Ed. 2d 564, 582 (1995); *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 678-79, 103 L. Ed. 2d 685, 710-11 (1989); *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 633-34, 103 L. Ed. 2d 639, 670 (1989).

The dissenting judge at the Court of Appeals, a recognized authority on children's law in North Carolina, aptly described the tension between child protection laws and constitutional principles:

Because of the substantial governmental interest in protecting children and the need to act quickly, as well as the additional time likely required to gather evidence in support of probable cause, it would be ill advised to utilize the probable cause standard. . . .

[However,] due to the sanctity of private dwellings and the potential for criminal investigation/ prosecution arising from the section 7B-302 investigation, a total suspension of the probable cause standard is not appropriate. A total suspension would permit entry into a home and interviews with the reported victim child, based simply on a totally unsubstantiated report . . . .

*Stumbo*, 143 N.C. App. at 386, 547 S.E.2d at 457-58 (Greene, J., dissenting).

For these reasons, the Fourth Amendment to the United States Constitution and Article I, Section 20 of the North Carolina Constitution required the trial court to determine that there existed reasonable grounds for suspecting the Stumbos had neglected their daughter before issuing a noninterference order pursuant to section 7B-302. The trial court should have considered the nature, circumstances, and veracity of the allegations, as well as any underlying facts and surrounding circumstances the reporter may have provided. Because the reasonable grounds standard is less demanding than probable cause, it necessarily raises the possibility, however remote, that an aberrant government official, detached from the moorings of the warrant and probable cause requirements, might be tempted to cloak a criminal investigation under the shroud of a child abuse inquiry. Nonetheless, the reasonable grounds standard accommodates the government's noble efforts to reduce the incidence of.child abuse and neglect without wholly abrogating the constitutional rights of children and caregivers.

Child abuse investigators can "effectively protect children without being excused from 'whenever practicable, obtaining advance judicial approval of searches and seizures.' " *Tenenbaum*, 193 F.3d at 604 (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 20 L. Ed. 2d 889, 905 (1968)). As recognized by the Seventh Circuit, DSS is not unduly burdened by securing judicial approval before entering a home precisely because judicial approval is not required in exigent circumstances where the director deems immediate action necessary to protect the safety or welfare of a child. *Doe v. Heck*, 327 F.3d 492, 517 n.20 (7th Cir.), *amended*, —— F.3d ——, 2003 U.S. App. LEXIS 9353 (7th Cir. 2003). Even the most benign motive, however, "cannot justify a departure from Fourth Amendment protections." *Ferguson v. City of Charleston*, 532 U.S. 67, 85, 149 L. Ed. 2d 205, 221 (2001).

The government concedes that "[i]n approximately 99% of the child protection investigations conducted by a county department of

social services, Investigative Social Workers enter the homes with the consent of the parents, guardians, or caretakers." Yet the government argues that even the less-stringent reasonable grounds standard for the remaining 1% of these cases will leave "many North Carolina children . . . at risk of suffering grave harm." Nonetheless, permitting government actors "to search suspected places without evidence of the act committed" and to enter homes where an "offense is not particularly described" is tantamount to issuing a general warrant expressly prohibited by the North Carolina Constitution. N.C. Const. art. I, § 20. The United States Constitution similarly commands that a warrant must "particularly describ[e] the place to be searched and the persons or things to be seized." U.S. Const. amend. IV; *see also Vernonia Sch. Dist.*, 515 U.S. at 669-70, 132 L. Ed. 2d at 584-85 (describing the framers' distaste for general warrants); *Payton*, 445 U.S. at 583-84, 63 L. Ed. 2d at 650 (O'Connor, J., dissenting) (same). Thus, to the extent DSS investigations must comply with the Fourth Amendment, it suffices to say that this is a legal constraint imposed by the people through their Constitution.

The need to investigate reports of neglect and abuse is paramount, but so is the degree of intrusion allegedly sought by the director here. "[A] person's home is his castle." *State v. Sparrow*, 276 N.C. 499, 512, 173 S.E.2d 897, 906 (1970) (citing *Semayne's Case*, 77 Eng. Rep. 194, 195 (1604), and *State v. Mooring*, 115 N.C. 709, 711, 20 S.E. 182, 182 (1894)). Indeed, "[t]he sanctity of the home is a revered tenet of Anglo-American jurisprudence." *State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987). As such, child protection investigators must establish reasonable grounds that child abuse or neglect is present before searching a private home. If DSS is not required to produce a case-specific justification prior to its search, it in essence possesses the equivalent of an unconstitutional general warrant. Such unilateral and unbridled authority opens the door to the possibility that arbitrary, insincere, and unsubstantiated reports of neglect or abuse would provide an adequate basis for governmental intrusion into a private home, even in the face of a proper assertion of constitutional rights.

III.

The Court of Appeals majority concluded that a private interview conducted pursuant to a child abuse or neglect investigation did not constitute a seizure under the Fourth Amendment. *Stumbo*, 143 N.C. App. at 382, 547 S.E.2d at 455.

A noninterference order may issue if a parent refuses to allow the director "personal access to the juvenile," or refuses to "allow the director to observe or interview the juvenile in private." N.C.G.S. § 7B-303(b). "A 'seizure' triggering the Fourth Amendment's protections occurs . . . when government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen.' " *Graham v. Connor*, 490 U.S. 386, 395 n. 10, 104 L. Ed. 2d 443, 455 n.10 (1989) (quoting *Terry*, 392 U.S. at 19 n.16, 20 L. Ed. 2d. at 905 n.16). Whether a citizen has been so restrained depends upon the circumstances of each case and whether, under those circumstances, "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509 (1980). Once the noninterference order was issued in the present case, with its attendant contempt sanctions for noncompliance, neither the juvenile nor any reasonable person would have felt at liberty to leave or to refuse to submit to the government's demand for a private interview.

Not surprisingly, federal appellate courts have concluded that a government actor's sequestration of a juvenile constitutes a seizure within the meaning of the Fourth Amendment. The Seventh Circuit recently concluded that a child who was "physically carried out of his home, placed in a car, and driven away from his family" by government actors, without the consent of his parents, had been seized within the meaning of the Fourth Amendment. *Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1010 (7th Cir. 2000). The Ninth Circuit has stated:

> Officials may remove a child from the custody of its parent without prior judicial authorization only if the information they possess at the time of the *seizure* is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.

*Wallis*, 202 F.3d at 1138 (emphasis added). In *Tenenbaum*, the Second Circuit concluded that a five-year-old was seized when she was taken from her school by a government official and was transported to a hospital where she was required to remain for several hours before being examined and returned to her parents. 193 F.3d at 602. Similarly, in *J.B. v. Washington Cty.*, 127 F.3d 919 (10th Cir. 1997), the appellate court approved a lower court ruling that temporary removal of a child from her home was a seizure implicating Fourth Amendment rights. *Id.* at 928.

The government has attempted to distinguish these cases on the basis that they involved the physical removal of a child, while the investigator here sought only an interview. Admittedly, in the present case it is difficult to ascertain the precise scope of the proposed interview. Nonetheless, the government has cited no authority in support of its proposition that we should reach a different result simply because physical removal of a child has not occurred. Under the North Carolina Constitution, any seizure is unlawful when justification for that seizure is "not particularly described and supported by evidence." N.C. Const. art. I, § 20. Similarly, physical restraint or removal is not a prerequisite to the occurrence of a seizure under the United States Constitution. *See Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509 (listing several examples of a "seizure" within the meaning of the Fourth Amendment).

Even when performing the important role of protecting children from abuse and neglect, government action must still comport with the Constitution. Certainly, these protections are not implicated in every case; however, the Constitution protects citizens from the more egregious and aberrational departures from acceptable behavior. *See, e.g., Brokaw*, 235 F.3d at 1007. At a minimum, the government must establish reasonable grounds to believe that child abuse or neglect is present before obtaining a noninterference order permitting a private interview pursuant to N.C.G.S. § 7B-303(b).

To clarify for purposes of future proceedings under chapter 7B, the statutory phrase "without lawful excuse" has ascertainable meaning and is not mere surplusage. *See State v. Buckner*, 351 N.C. 401, 408, 527 S.E.2d 307, 311 (2000) (when interpreting a statute, courts must give meaning to all of the statute's provisions). N.C.G.S. § 7B-303(c) requires a trial court to find by "clear, cogent, and convincing evidence that the respondent, *without lawful excuse*, has obstructed or interfered with an investigation required by G.S. § 7B-302. " N.C.G.S. § 7B-303(c) (emphasis added). As government officials, directors must demonstrate more than a parent or caregiver's refusal to comply with unsupported governmental demands: They must provide the trial court with particularized allegations supported by evidence. N.C. Const. art. I, § 20. When such allegations are anonymous, the trial court should carefully scrutinize DSS' proffered justification for search or seizure. *See generally Florida v. J.L.*, 529 U.S. 266, 270, 146 L. Ed. 2d 254, 260 (2000) ("anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity" absent suitable corroboration).

IN RE STUMBO

[357 N.C. 279 (2003)]

In the present case, the trial court should have made inquiry into the objections raised by the Stumbos. Once the Stumbos raised a constitutional objection, the director had the onus of demonstrating that a 7B-303 order should issue. Indeed, the statute makes clear that "[t]he burden of proof shall be on [the government]." N.C.G.S. § 7B-303(c). The trial court never considered the Stumbos' objection, thus ignoring the "lawful excuse" language of the statute and the Stumbos' properly raised constitutional objection. The trial court should have considered the allegations directed against the Stumbos as well as any evidence tending to show that such allegations were unfounded in determining whether the government should be permitted to enter a private home over the objections of its owner, or to interview the children in private without the consent of their parents.

I agree with the majority that the trial court erred by granting a noninterference order under the facts and circumstances of the instant case and therefore concur in the result reached by the majority opinion.

Chief Justice LAKE and Justice BRADY join in this concurring opinion.