McGEE, Judge.
J.H. (respondent) appeals an order adjudicating his son J.M.H. to be neglected and granting custody of J.M.H. to the Person County Department of Social Services (DSS) for placement in therapeutic foster care. We affirm the trial court's order.
DSS filed a juvenile petition on 27 June 2002 alleging that J.M.H. was a neglected juvenile because he had "not [been] provided necessary medical care." An order for nonsecure custody was entered 2 July 2002, finding that there was a "reasonable factual basis to believe that . . . [J.M.H.] is in need of medical treatment to cure, alleviate, or prevent serious physical harm . . . and [J.M.H.'s] parent, guardian, custodian, or caretaker is unwilling or unable to provide or consent to the medical treatment." A hearing was held 23 September and 30 September 2002. Evidence showed that respondent and J.M.H.'s mother, K.H., had been separated for six years, and that while no custody agreement or order had been entered as to J.M.H., respondent had physical custody of J.M.H. for the majority of the six-year period. J.M.H. had been diagnosed as mildly mentally retarded, with depressive and disruptive behavior disorders, and attention-deficit/hyperactivity disorder (ADHD). J.M.H. had been placed in special education classes for most of the time that he had been enrolled in school, and that after being transferred from one school to another, he began having behavioral problems. In November 2001, respondent enrolled J.M.H. in counseling with Orange Person Chatham Counseling Center (Counseling Center) because respondent was concerned about J.M.H.'s aggressive behavior.
DSS's evidence showed that respondent had allowed K.H. to have custody of J.M.H. during weekdays in May and June 2002 because respondent had to work; respondent then resumed care of J.M.H. on weekends. K.H. testified that on 14 June 2002, she left J.M.H. in the care of a babysitter. K.H. further testified that J.M.H. and his sister got into a fight and that when the babysitter tried to break up the fight, J.M.H. pushed the babysitter into the side of the refrigerator. The babysitter called to her boyfriend to help restrain J.M.H. and, during this process, a table was knocked over. J.M.H. threatened the boyfriend with a piece of wood and threatened to start a fire in the air conditioning unit at the babysitter's home. K.H. also testified that upon learning of this incident, she called Jennifer Mize (Mize), a child and family therapist at the Counseling Center, who advised K.H. to contact a social worker. The social worker referred K.H. to Dr. McDaniel, a primary physician who was J.M.H.'s regular general practitioner. Dr. McDaniel recommended that K.H. have J.M.H. evaluated at Duke University Hospital or the University of North Carolina Hospital (UNC Hospitals). J.M.H. was admitted to UNC Hospitals for evaluation and treatment and stayed there for approximately two weeks. UNC Hospitals recommended therapeutic foster care.
Mize testified that she also recommended therapeutic foster care and that she believed J.M.H. needed this extra level of care. Mize had observed significant discord between K.H. and respondent and stated that each blamed the other for J.M.H.'s problems. She testified that although both K.H. and respondent cared about J.M.H., they were unable to put aside their personal differences and could not agree how to address J.M.H.'s problems. Mize read from a letter that she had sent to DSS in which she stated that she thought J.M.H. needed a legal custodian "so that more intensive mental health services [could] begin." Mize attributed some of J.M.H.'s problems to respondent's and K.H.'s expending "their energy fighting with each other rather than working together for [J.M.H.'s] benefit," and stated that until respondent and K.H. were able "to provide a safe, stable, nurturing environment for [J.M.H.] with consistent rules and a consistent home environment, [J.M.H.'s] prognosis [would] be poor." Similarly, Dr. Erin Malloy (Dr. Malloy), Director of In-patient Child and Adolescent Services with the Department of Psychiatry at UNC Hospitals, testified that during J.M.H.'s hospitalization, there was a high degree of conflict between respondent and K.H. and that this ongoing discord was disrupting J.M.H.'s progress. The psychiatric team at UNC Hospitals noted that respondent's behavior, when he visited J.M.H., "was perceived as hostile and threatening." UNC Hospitals ultimately made the decision that "it was therpeutically necessary to suspend phone calls and visits between [J.M.H.] and [respondent and K.H.]."
Dr. Malloy also read from a letter that UNC Hospitals had sent to DSS, which stated that
[a] number of our staff [have] felt threatened by [respondent's] belligerent and accusatory tone. He has accused our staff of giving him misinformation and falsifying information. One example of many is that he hung up on our doctor after accusing her of giving a medication that kills people.
We believe that [J.M.H.] is at significant risk of developing further maladaptive coping skills such as aggression unless he is removed from this chaotic and severely dysfunctional environment.
DSS's evidence further showed that while K.H. was not happy about the recommendation for therapeutic foster care, she thought it would be best for J.M.H. Respondent, however, thought it would be best for J.M.H. to stay with his family, specifically with respondent. No immediate therapeutic foster care could be found and, upon discharge from UNC Hospitals, J.M.H. was placed with his paternal grandmother, Bertha Gallant (Gallant). Shortlythereafter, J.M.H. was hospitalized in the mental health facility at Moses Cone Hospital in Greensboro. After this hospitalization, J.M.H. was placed in therapeutic foster care in Durham on 6 September 2002.
Respondent testified that J.M.H. did not have any behavior problems when he lived with respondent, and that J.M.H.'s behavior problems occurred only when he was with K.H. Respondent further testified that while J.M.H. was living with Gallant, J.M.H. was hospitalized after he became so angry he kicked a hole in the wall. Respondent attributed this violence to the medication prescribed by the doctors at UNC Hospitals. Respondent testified that after one visit with J.M.H. at UNC Hospitals, he was denied access to J.M.H., and that he was told by Robert Laws (Laws), the clinical social worker handling J.M.H.'s case at UNC Hospitals, that he could not visit or speak to J.M.H. Respondent testified that Laws also informed him about the recommendation that J.M.H. be placed in therapeutic foster care, to which respondent objected. Respondent testified that he did not want J.M.H. to receive therapeutic foster care because he believed that J.M.H. had not assaulted or threatened the babysitter. Respondent testified that J.M.H. had told respondent that the babysitter had grabbed J.M.H. by the throat and told J.M.H. she would kill him. Respondent believed the decision to recommend therapeutic foster care "was recommended without knowledge of how [J.M.H.] . . . was in [respondent's] home."
Respondent also testified that no one ever offered to trainhim to provide the therapeutic care that would be offered to J.M.H. through therapeutic foster care. He further testified that no one ever told him why J.M.H. required therapeutic foster care other than he needed it because respondent and K.H. argued. Respondent testified that he did not argue with K.H., but that she argued with him when he was trying to make sure J.M.H. was safe when J.M.H. was with her. Respondent further testified that he only talked once with J.M.H.'s attending physician at UNC Hospitals. Respondent stated that he did not deliberately hang up on this doctor but that his cell phone had "lost the signal and cut off."
The trial court made the following findings of fact:
19. That [respondent] was not consulted prior to this hospitalization [at UNC Hospitals]; the fact that he was not consulted made him upset;
20. That [K.H.] was able to discuss [J.M.H.'s] condition with the medical personnel and social workers at UNC Hospitals on a daily basis;
21. That the personnel at UNC Hospitals testified that [respondent] was belligerent, uncooperative, and they could not deal with his attitudes in their facility; they deemed that he was not helping in [J.M.H.'s] treatment;
22. That [respondent] testified that he did not regularly attempt to make contact with personnel at UNC Hospitals relative to the treatment of [J.M.H.];
23. That [respondent] was made aware that UNC Hospitals recommended a therapeutic foster home for [J.M.H.], to continue his treatment;
24. That [respondent] was made aware that OPC recommended a therapeutic foster home for [J.M.H.] prior to [J.M.H.'s] release from UNC Hospitals;
25. That [respondent] rejected those recommendations and offers, saying that he wished to look after [J.M.H.] as he had done for the previous six years;
26. That [respondent and K.H.] are unable to discuss the treatment of [J.M.H.] without argument between themselves; they also argue about the treatment needed for [J.M.H.] in front of [J.M.H.], and in front of treating personnel;
. . . .
30. [Respondent] further asserts that the diagnosis and recommendations of UNC Hospitals were based on bad and incomplete information in that the professionals at UNC Hospitals had insufficient contact with him;
31. However, [respondent's] behavior was in fact the reason he was unable to convey any necessary information to [the] professionals;
32. [Respondent] did not make reasonable and appropriate efforts to contact the doctors at UNC Hospitals and provide them such information;
33. [Respondent's] behavior had the very effect of preventing appropriate contact between [respondent] and such medical professionals;
34. There was clear evidence of family discord between [respondent and K.H.], and that was even conceded by [respondent] in testimony;
35. That [respondent] was asserting that the medications prescribed for [J.M.H.] were wrong, when in fact [respondent] had never determined the diagnosis for [J.M.H.];
36. That prior to filing this action, [DSS] discussed [J.M.H.'s] situation with [respondent] and allowed [respondent] to take reasonable steps to get [J.M.H.] proper medical assistance; [respondent] failed and refused to acquire recommended mental health treatment for [J.M.H.];
37. That [DSS] has made reasonable efforts prior to removal, to keep [J.M.H.] in the custody of [either respondent or K.H.];
38. Due to the conduct of [respondent] in refusing medical treatment for [J.M.H.], efforts have not been undertaken to reunite the family;
39. That despite the efforts of [DSS], the conduct of [respondent and K.H.] and other factors mentioned above render that living situation inappropriate for [J.M.H.][.]
Based on these findings of fact, the trial court entered an adjudication and disposition order on 2 December 2002, concluding:
1. That [J.M.H.] is a neglected child as alleged in the Petition;
2. That it is not in the best interest of [J.M.H.] for his custody to be returned to [respondent and K.H.], or either of them;
3. That it is in the best interest of [J.M.H.] that his custody be granted to [DSS][.]
Respondent petitioned this Court for a writ of certiorari on 21 October 2003 to appeal the 2 December 2002 order, which our Court granted on 13 November 2003.
Respondent's sole assignment of error is that the trial court erred in finding J.M.H. to be a neglected child and in awarding custody to DSS for placement in therapeutic foster care. We disagree.
In reviewing a trial court's finding of neglect, our Court must determine "(1) whether the findings of fact are supported by 'clear and convincing evidence,' [N.C. Gen. Stat. § 7B-805 (2003)],and (2) whether the legal conclusions are supported by the findings of fact." In re Gleisner, 141 N.C. App. 475, 480, 539S.E.2d 362, 365 (2000). If there is clear and convincing evidence to support the trial court's findings of fact, then the findings "are deemed conclusive, even where some evidence supports contrary findings." In re Helms, 127 N.C. App. 505, 511, 491 S.E.2d 672, 676 (1997). We uphold a trial court's conclusions of law when they are supported by the trial court's findings of fact. Id.; see also In re Pittman, 149 N.C. App. 756, 763-64, 561 S.E.2d 560, 566, disc. review denied, 356 N.C. 163, 568 S.E.2d 609 (2002).
A neglected juvenile is "[a] juvenile who does not receive proper care, supervision, or discipline from a juvenile's parent . . . or who is not provided necessary medical care; or who is not provided necessary remedial care[.]" N.C. Gen. Stat. § 7B-101(15) (2003). Respondent argues, and this Court has held, that to find neglect, "there [must] be some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure to provide `proper care, supervision, or discipline.'" In re Safriet, 112 N.C. App. 747, 752, 436 S.E.2d 898, 901-02 (1993) (quoting N.C. Gen. Stat. § 7B-101(15)). Respondent, however, stops short of arguing that J.M.H. has not been impaired or is not at risk of such impairment as a result of the failure to provide proper care. Due to the failure of respondent and K.H. to provide proper care to J.M.H., the record includes sufficient evidence of mental and emotional impairment of J.M.H. to support the trial court's findings of fact.
DSS presented evidence, and the trial court found, that J.M.H. was diagnosed as being mildly mentally retarded, having depressiveand disruptive behavior disorders, and ADHD. He underwent counseling and therapy and had to be involuntarily committed to psychiatric units at UNC Hospitals and Moses Cone Hospital because of violent and aggressive behavior. UNC Hospitals submitted a letter to DSS that said its doctors believed that "the severe family discord [between respondent and K.H.] is a root cause of [J.M.H.'s] maladaptive behavior." The letter said that when the doctors or social workers at UNC Hospitals talked with respondent and K.H., each one spent most of that time berating the other parent. Furthermore, each parent has inappropriately shared such information [with J.M.H.]. Despite earnest attempts on the part of our staff to supervise contact between each parent and [J.M.H.], his exposure to their own conflict has continued. In fact, we believe this conflict is so detrimental to the child that we have restricted all contact from the parents with [J.M.H.]. . . . We believe that this child is at significant risk of developing further maladaptive coping skills such as aggression unless he is removed from this chaotic and severely dysfunctional environment.
Similarly, Mize, the counselor who treated J.M.H. at the Counseling Center, wrote a letter to DSS in which she stated:
[i]n order for [J.M.H.] to receive some symptom relief and begin to improve, it is our recommendation that he receive therapeutic foster care to provide a calm, stable, nurturing environment and to remove him from the chaos and violence he witnesses at home and between his parents. Until both parents are able to recognize their part in [J.M.H.'s] problems and to provide a safe, stable, nurturing environment for him with consistent rules and a consistent home environment, his prognosis will be poor.
This evidence is clear and convincing that J.M.H. has sufferedemotional and mental impairment due to respondent's and K.H.'s troubled relationship, which disrupts their ability to provide proper care, and that J.M.H. will continue to risk such suffering. See Safriet, 112 N.C. App. at 752, 436 S.E.2d at 901-02.
Respondent argues that, in addition to causing an impairment, a parent's conduct must be severe or dangerous to constitute neglect. Respondent directs us to a recent North Carolina Supreme Court case, In re Stumbo, in which the Court noted that "not every act of negligence on the part of parents or other care givers constitutes `neglect' under the law and results in a 'neglected juvenile.'" In re Stumbo, 357 N.C. 279, 283, 582 S.E.2d 255, 258 (2003) (holding that a "single report of a naked, unsupervised two-year-old in the driveway of her home does not trigger the investigative requirements of N.C.G.S. § 7B-302," Stumbo, 357 N.C. at 288, 582 S.E.2d at 261, which mandates DSS to investigate reports of abuse, neglect and dependency). In Stumbo, the Court reviewed a number of cases where neglect had been found and held that the parents' conduct in those cases "constituted either severe or dangerous conduct or a pattern of conduct either causing injury or potentially causing injury to the juvenile." Id. at 283, 582 S.E.2d at 258. Respondent argues that our present case is distinguishable from the cases described in Stumbo where neglect was found, because those cases involved "severe alcohol abuse, physical injuries to the child, insufficient food in the house and failure to immunize children against childhood diseases," and that none of those issues are implicated here. However, we do not findthat our Supreme Court intended to limit the instances of neglect to just the circumstances listed.
In other cases, a child has been neglected if he or she "is not provided necessary medical care." In re Huber, 57 N.C. App. 453, 458, 291 S.E.2d 916, 919, disc. review denied, 306 N.C. 557, 294 S.E.2d 223 (1982). In Huber, neglect was found where the mother refused to allow her daughter to have speech and hearing treatment and other remedial care, when the child had a hearing and speech defect. Id. Without treatment, the child would "not be educated to her full potential; she [would] suffer emotionally by being unable to communicate with other persons; she [would] probably be unable to read." Id. This Court thus held that the mother's refusal "to permit [the child] to receive this opportunity to progress toward her full development" constituted neglect. Id.
Respondent presented some evidence that he took steps to provide necessary care for J.M.H. For instance, respondent argues that his conduct is not severe in that he worked with the public schools "to ensure that [J.M.H.] received educational services that met the child's individual and specific needs," that he "voluntarily took [J.M.H.] to counseling services," and that he "had also agreed to various trial medications for [J.M.H.] although logistically this had proven problematic." However, although there is some evidence to possibly support contrary findings, see In re Helms, 127 N.C. App. at 511, 491 S.E.2d at 676, there is sufficient evidence to show that this case is similar to Huber in that respondent refused medical treatment that would allow J.M.H. todevelop to his full potential.
There was competent evidence presented at trial showing that on several occasions before DSS filed a petition alleging neglect, respondent had refused to provide recommended mental health treatment to J.M.H. or had interfered with J.M.H.'s being provided with much of the recommended mental health treatment. At the hearing, Mize testified that respondent did not allow J.M.H. to continue on a Ritalin study for the full recommended period in January 2002. Respondent testified that he believed the medication prescribed by UNC Hospitals caused J.M.H.'s violent behavior. Mize, Dr. Malloy, and respondent testified that respondent objected to J.M.H. being placed in therapeutic foster care. Additionally, evidence showed that despite having been advised that their discord was getting in the way of J.M.H.'s treatment, respondent and K.H. continued to argue and continued to disagree on a course of treatment for J.M.H. Mize noted in her letter to DSS that
the opportunity for change is minimal as long as both parents continue to expend their energy fighting with each other rather than working together for [J.M.H.'s] benefit. As this has been recommended multiple times I am not convinced that either parent will be able to meet this goal without considerable intervention for themselves.
DSS also presented evidence that respondent had called UNC Hospitals to say that it was illegally treating J.M.H. because K.H., who had committed J.M.H., did not have custody. Treatment was stopped until UNC Hospitals could verify that there was no legal custody arrangement. Finally, the letter from UNC Hospitals to DSS detailed how respondent hung up on one of J.M.H.'s treatingphysicians after accusing the physician of prescribing medication that killed people. When respondent was asked about this telephone call, he gave conflicting testimony. He first testified that his "phone [had] lost the signal and cut off," and that he had tried to call back immediately but did not get a signal. Respondent later testified, however, that he called the doctor back to apologize for his telephone shorting out but "was told that she didn't want to speak to [him]." As in Huber, respondent's conduct regarding medical treatment for J.M.H. constitutes neglect. See Huber, 57 N.C. App. at 458, 291 S.E.2d at 919. The trial court's conclusion that J.M.H. was a "neglected juvenile" is consistent with the cases, described in Stumbo, where neglect was found. See Stumbo, 357 N.C. at 284-85, 582 S.E.2d at 258-59.
There was clear and convincing evidence to support the trial court's findings of neglect; the trial court's findings of fact supported its conclusion that J.M.H. was a neglected juvenile and that his best interests were served by granting custody of J.M.H. to DSS. We affirm the order of the trial court.
Affirmed.
Chief Judge MARTIN and Judge WYNN concur.
Report per Rule 30(e).