IN THE SUPREME COURT OF NORTH CAROLINA

 2021-NCSC-108

 No. 48A21

 Filed 24 September 2021

 IN THE MATTER OF: K.B. & G.B.

 Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from orders entered on 20

 October 2020 by Judge Beverly Scarlett in the District Court of Orange County. This

 matter was calendared for argument in the Supreme Court on 19 August 2021 but

 determined on the record and briefs without oral argument pursuant to Rule 30(f) of

 the North Carolina Rules of Appellate Procedure.

 Stephenson & Fleming, LLP, by Deana K. Fleming, for petitioner-appellee
 Orange County Department of Social Services.

 Steven C. Wilson for appellee Guardian ad Litem.

 Jeffrey L. Miller for respondent-appellant mother.

 Sydney Batch for respondent-appellant father.

 HUDSON, Justice.

¶1 Respondents appeal from orders terminating their parental rights in their

 children, K.B. (Kate)1 and G.B. (Greg) (collectively the children). Respondent-mother

 challenges the trial court’s conclusion that grounds existed to terminate her parental

 rights in the children pursuant to N.C.G.S. § 7B-1111(a)(1) and (2) (2019).

 1 Pseudonyms are used to protect the identity of the juveniles and for ease of reading.
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

 Respondent-father argues the trial court abused its discretion in concluding that it

 was in the children’s best interests that his parental rights be terminated. For the

 reasons stated herein, we affirm.

 I. Background

¶2 Respondents are the parents of Kate, born in September 2012, and Greg, born

 in December 2014. On 22 February 2013, Orange County Department of Social

 Services (DSS) filed a petition alleging Kate was a neglected and dependent juvenile.

 The petition alleged that in September 2012, DSS received a report that respondents

 had a violent argument wherein law enforcement was called, both parents were

 intoxicated, and Kate was present. As a result of this incident, respondents signed a

 safety plan in which they agreed to refrain from drinking when caring for Kate and

 from arguing in Kate’s presence. On 1 November 2012, however, law enforcement

 responded to another domestic violence call. Then, on 25 December 2012, respondent-

 father reported to law enforcement that respondent-mother was intoxicated and

 driving with Kate in the back seat of the car. On 14 February 2013, respondent-

 mother was stopped by the North Carolina Highway Patrol for driving under the

 influence. A safety agreement was reached where respondent-mother agreed to not

 drive Kate except to drop her off at daycare in the mornings. The petition further

 alleged that respondent-father completed a substance abuse assessment and had

 been cooperative with DSS but continued to abuse alcohol. He acknowledged his
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

 addiction and agreed to seek treatment. Respondent-mother was less cooperative

 with DSS and denied her addiction. DSS alleged that Kate was at high risk of harm

 due to respondents’ substance abuse.

¶3 On 5 March 2013, respondents agreed to entry of a consent order that granted

 temporary custody of Kate to DSS. On 21 March 2013, the trial court entered a

 temporary custody order continuing Kate’s custody with DSS. On 29 May 2013, Kate

 was adjudicated a neglected and dependent juvenile, and the trial court concluded

 that it was in her best interests that she remain in the custody of DSS. Respondent-

 mother was ordered to complete a screening for Family Drug Treatment Court

 (FDTC) and, if accepted, to comply with treatment recommendations. In the event

 she was not accepted into FDTC, the court ordered her to engage in intensive

 outpatient substance abuse services and to follow all recommendations. Respondent-

 father was ordered to continue to engage in substance abuse treatment and follow all

 recommendations and to engage in mental health treatment to address anger issues.

 Respondents were ordered to complete drug and alcohol screens as requested by DSS,

 to refrain from using drugs or alcohol, and to have supervised visitation with Kate.

¶4 On 7 August 2013, the trial court entered an order suspending Kate’s visitation

 with respondent-mother. The trial court entered a permanency planning order on 17

 December 2013 reinstating respondent-mother’s supervised visitation with Kate and

 setting the permanent plan for Kate to be reunification with respondent-father with
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

 a concurrent plan of reunification with respondent-mother. The trial court entered a

 permanency planning order on 19 March 2014, setting reunification with respondent-

 father as the permanent plan for Kate with a concurrent plan of guardianship with

 the maternal grandmother and authorizing a trial home placement of Kate with

 respondent-father. On 30 January 2015, the trial court entered a permanency

 planning and custody order awarding respondent-father custody of Kate and granting

 supervised visitation to respondent-mother. The order transferred jurisdiction from

 juvenile to domestic court pursuant to N.C.G.S. § 7B-911.

¶5 On 17 December 2015, DSS filed juvenile petitions alleging that Kate and Greg

 were neglected and dependent juveniles. The petitions alleged that on 11 December

 2015, DSS received a report of domestic violence and substance abuse by respondents.

 Respondent-mother reported that respondent-father had been “smoking crack” at

 least five times a week, drinking alcohol, and acting erratically. She also reported

 that domestic violence occurred between them. Respondent-father was arrested on 9

 December 2015 and released the following day. Respondents failed to complete a drug

 screen as requested. Respondent-father reported taking Percocet, and respondent-

 mother reported using alcohol and marijuana a month earlier.

¶6 On 22 December 2015, respondents agreed to the entry of a consent order that

 continued non-secure custody and placement authority with DSS. On 29 February

 2016, the trial court entered an order adjudicating Kate and Greg to be neglected
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

 juveniles and continuing custody with DSS. Respondents were ordered to, among

 other things, participate in substance abuse services and follow recommendations,

 submit to random drug screens, participate in individual therapy, and participate in

 supervised visitation with the children. On 15 June 2016, the trial court entered a

 custody order that continued custody of Kate and Greg with DSS and set the primary

 plan as reunification with a parent, with a secondary plan of guardianship/custody

 with a relative.

¶7 On 3 January 2017, the trial court entered a permanency planning order

 authorizing a trial home placement of Kate and Greg with respondent-father. The

 trial court entered a permanency planning and custody order on 9 March 2017

 awarding custody of Kate and Greg to respondent-father and granting supervised

 visitation to respondent-mother. The order transferred jurisdiction from juvenile to

 domestic court pursuant to N.C.G.S. § 7B-911.

¶8 On 11 April 2019, DSS obtained non-secure custody of Kate and Greg and

 placed them in their maternal grandmother’s home, where respondent-mother was

 also living. DSS also filed juvenile petitions alleging them to be neglected juveniles.

 The petition alleged that on 7 April 2019, there was an argument between

 respondent-father and his eldest daughter’s2 boyfriend in which respondent-father

 attempted to strike the boyfriend with a bat and aimed a gun at him. Kate was inside

 2 Respondent-father’s eldest daughter is not a subject of this appeal.
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

 the home during the incident. On 10 April 2019, DSS received a Child Protective

 Services (CPS) report that respondent-father had physically abused his eldest

 daughter. His eldest daughter reported that respondent-father was abusing

 substances, sleeping all day (resulting in her truancy), and staying away from home

 for extended periods of time without communication. Respondent-mother completed

 a drug screen on 9 January 2019 which was “positive for extended opiates,

 oxycodone.” Respondent-mother had not engaged in any substance abuse treatment

 since respondent-father was awarded custody of Kate and Greg in 2017. The petition

 further alleged Kate and Greg were at substantial risk of mental, physical, and

 emotional impairment in the care and custody of respondent-father, and respondent-

 mother was not appropriate for placement. On 16 April 2019, respondents agreed to

 a consent order that continued custody of Kate and Greg with DSS, ordered

 supervised visitation with respondent-father, and ordered respondent-mother to be

 supervised at all times around the children.

¶9 On 13 August 2019, the trial court entered an order adjudicating Kate and

 Greg to be neglected juveniles. The trial court continued the children’s placement

 with their maternal grandmother and allowed respondent-mother to continue living

 in the home with the children, as long as her contact with them was supervised by

 the maternal grandmother or other DSS-approved supervisor. Respondent-father

 was granted supervised visitation with the children. Respondent-father was ordered
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

 to: comply with random drug screens; complete an assessment with Pathways to

 Change and follow recommendations; complete updated mental health and substance

 abuse assessments and follow recommendations; and comply with all

 recommendations of FDTC. Respondent-mother was ordered to comply with random

 drug screens and complete a substance abuse and mental health assessment and

 follow all recommendations.

¶ 10 On 6 August 2019, respondent-mother filed a motion for unsupervised

 visitation with the children. On 29 August 2019, the trial court ordered respondent-

 mother to comply with random drug screens, to complete A Fresh Start treatment

 program and follow recommendations, to engage in current substance abuse

 treatment consistent with her case plan, and to have negative drug screens. The trial

 court also ordered that respondent-mother’s visitation and contacts with the children

 should remain supervised, but granted DSS and the treatment team discretion to

 allow unsupervised visitation and contact upon respondent-mother’s compliance with

 the order.

¶ 11 On 22 October 2019, the trial court entered a custody review order finding that

 respondent-mother tested positive for oxycodone in January 2019, April 2019, and

 May 2019 and tested positive for amphetamines, heroin, and alcohol on 28 August

 2019. Respondent-mother had failed to consistently engage in individual or group

 therapy, and her current engagement in treatment at A Fresh Start did not meet her
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

 current level of need. The trial court found that respondent-father lost his housing in

 June 2019. He was diagnosed with cocaine, alcohol, cannabis, and opioid dependence

 and had not been compliant with requested drug screens. The trial court continued

 custody of the children with DSS, continued the children’s placement with the

 maternal grandmother, authorized respondent-mother to live in the placement with

 the children, and continued respondent-father’s supervised visitation with the

 children.

¶ 12 In January 2020, DSS learned that respondent-mother had taken the children,

 without the maternal grandmother, to Raleigh unsupervised. As a result, on 9

 January 2020, Kate and Greg were moved to a foster home.

¶ 13 Following a permanency planning hearing on 16 January 2020, the trial court

 entered an order on 3 February 2020 finding that respondent-father was currently

 homeless and had not consistently engaged in treatment or services. Respondent-

 father had completed detox in May, June, and August of 2019. After his discharge

 from detox in June, “he went to an Oxford House but was asked to leave in the first

 week of July,” and after his discharge from detox in August, he went to a halfway

 house but left after approximately two weeks. The trial court further found that

 respondent-mother had been unable to sustain consistent engagement in services to

 address her substance abuse and mental health issues until recently. She had tested

 positive for alcohol, heroin, and opiates in October, November, and December 2019,
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

 and positive for alcohol in January 2020. Respondent-mother had not been in contact

 with DSS since 22 October 2019 and had failed to maintain stable housing and

 transportation. The primary permanent plan for Kate and Greg was changed to

 adoption with a secondary plan of reunification.

¶ 14 On 28 April 2020, DSS filed motions to terminate respondents’ parental rights

 in Kate and Greg. DSS alleged that respondents had neglected the children, see

 N.C.G.S. § 7B-1111(a)(1) (2019), and willfully placed them in foster care or placement

 outside the home for more than twelve months without showing reasonable progress

 to correct the conditions which led to their removal, see N.C.G.S. § 7B-1111(a)(2)

 (2019).

¶ 15 Following hearings on 20 August 2020 and 8 September 2020, the trial court

 entered orders on 20 October 2020 concluding that grounds existed to terminate

 respondents’ parental rights in the children pursuant to N.C.G.S. § 7B-1111(a)(1) and

 (2). The trial court also concluded that it was in the children’s best interests that

 respondents’ parental rights be terminated and terminated respondents’ parental

 rights. Respondents appeal.

 II. Analysis

 A. Respondent-mother’s Appeal

¶ 16 Respondent-mother challenges some of the trial court’s findings of fact as not

 being supported by the evidence and contends the trial court’s findings of fact were
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

 insufficient to support its conclusions that grounds existed to terminate her parental

 rights under N.C.G.S. § 7B-1111(a)(1)–(2). We first address termination under

 N.C.G.S. § 7B-1111(a)(1).

¶ 17 “Our Juvenile Code provides for a two-step process for termination of parental

 rights proceedings consisting of an adjudicatory stage and a dispositional stage.”

 In re Z.A.M., 374 N.C. 88, 94 (2020) (citing N.C.G.S. §§ 7B-1109, -1110 (2019)). “At

 the adjudicatory stage, the petitioner bears the burden of proving by ‘clear, cogent,

 and convincing evidence’ the existence of one or more grounds for termination under

 section 7B-1111(a) of the General Statutes.” In re A.U.D., 373 N.C. 3, 5–6 (2019)

 (quoting N.C.G.S. § 7B-1109(f) (2019)). We review a trial court’s adjudication of

 grounds to terminate parental rights “to determine whether the findings are

 supported by clear, cogent and convincing evidence and the findings support the

 conclusions of law.” In re E.H.P., 372 N.C. 388, 392 (2019) (quoting In re Montgomery,

 311 N.C. 101, 111 (1984)). Unchallenged findings are deemed to be supported by the

 evidence and are binding on appeal. In re Z.L.W., 372 N.C. 432, 437 (2019). “The trial

 court’s conclusions of law are reviewable de novo on appeal.” In re C.B.C., 373 N.C.

 16, 19 (2019).

¶ 18 Under N.C.G.S. § 7B-1111(a)(1), a trial court may terminate parental rights if

 it concludes the parent has neglected the juvenile within the meaning of N.C.G.S.

 § 7B-101. N.C.G.S. § 7B-1111(a)(1) (2019). A neglected juvenile is defined, in
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

 pertinent part, as a juvenile “whose parent, guardian, custodian, or caretaker does

 not provide proper care, supervision, or discipline; or who has been abandoned; . . . or

 who lives in an environment injurious to the juvenile’s welfare[.]” N.C.G.S. § 7B-

 101(15) (2019). The conditions at issue must result in “some physical, mental, or

 emotional impairment of the juvenile or a substantial risk of such impairment . . . .”

 In re Stumbo, 357 N.C. 279, 283 (2003) (citation omitted).

 Termination of parental rights based upon this statutory
 ground requires a showing of neglect at the time of the
 termination hearing or, if the child has been separated
 from the parent for a long period of time, there must be a
 showing of a likelihood of future neglect by the
 parent. When determining whether such future neglect is
 likely, the district court must consider evidence of changed
 circumstances occurring between the period of past neglect
 and the time of the termination hearing.

 In re R.L.D., 375 N.C. 838, 841 (2020) (cleaned up). “A parent’s failure to make

 progress in completing a case plan is indicative of a likelihood of future neglect.”

 In re M.A., 374 N.C. 865, 870 (2020) (quoting In re M.J.S.M., 257 N.C. App. 633, 637

 (2018)).

¶ 19 Here, there were no allegations that respondent-mother was currently

 neglecting Kate and Greg at the time of the termination hearing. Moreover, it is

 undisputed that the children were out of respondent-mother’s custody for an extended

 period of time and that they were previously adjudicated to be neglected juveniles on

 13 August 2019. Accordingly, the issue before this Court is whether the trial court
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

 properly determined that there was a likelihood of future neglect if the children were

 returned to respondent-mother’s care.

¶ 20 In its termination orders, the trial court made numerous findings of fact to

 support its conclusion that grounds existed to terminate respondent-mother’s

 parental rights pursuant to N.C.G.S. § 7B-1111(a)(1), as described in the background

 section of this opinion. The trial court found that respondent-mother failed to take

 the juvenile case, CPS involvement, and her substance use disorder seriously, and

 that respondent-mother’s continued drug use, failure to maintain a safe and stable

 home, and failure to assure the children received necessary care and supervision

 subjected the children to the risks of physical and emotional harm and created an

 injurious environment. The trial court found that there was likelihood of a repetition

 of neglect if the children were returned to respondent-mother’s care because she had

 not appropriately engaged in or completed recommended substance abuse or mental

 health treatment, and she had continued to deny that her substance use was an issue

 related to parenting, failed to understand concerns related to her unsupervised

 contact with and transporting of the children, failed to make any efforts to address

 her history of domestic violence and its impact on the children, and failed to maintain

 or establish a safe home for the children.

¶ 21 On appeal, respondent-mother first argues that “[o]ther than her drug screen

 test results showing substance use and the two incidents of a lack of supervision, and
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

 her inconsistent engagement in therapy,” there was no evidence presented of any

 actual impact or impairment suffered by the children. She asserts that the trial

 court’s findings “shed little light” on how her substance use and inconsistent

 engagement in mental health treatment impacted the children. We disagree.

¶ 22 As noted above, to establish neglect, the conditions at issue must result in

 “some physical, mental, or emotional impairment of the juvenile or a substantial risk

 of such impairment . . . .” In re Stumbo, 357 N.C. at 283 (citation omitted). Here, the

 trial court made express findings that Kate and Greg were impaired or at a

 substantial risk of impairment as a result of respondent mother’s neglect. Regarding

 both children, the trial court found:

 [81. and 82.] Respondent mother failed to take the juvenile
 case, CPS involvement, and her substance use disorder
 seriously. She incredulously fails to understand the noted
 safety concerns of the [children] unsupervised in her care
 while she continues to use unprescribed and illegal
 substances.3

¶ 23 Regarding Kate, the trial court found:

 83. [Kate] was impaired and at a substantial risk of
 impairment as a result of Respondent mother’s neglect.
 Specifically, this court finds [the] following facts:

 a. This court references and fully incorporates
 Findings of Fact numbers 1 through 82 and subparts
 set forth above as if set forth fully below as findings

 3 This finding of fact is labeled as finding of fact number 82 in the order terminating

 respondent-mother’s parental rights in Kate. It is labeled finding of fact 81 in the order
 terminating respondent-mother’s parental rights in Greg.
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

 of fact.

 b. Respondent mother’s continued drug abuse, her
 failure to maintain a safe and stable home, and her
 failure to assure that [Kate] receives necessary care
 and supervision subjects [Kate] to the risks of
 physical and emotional harm and creates an
 environment injurious to her welfare.

 c. [Kate] exhibits parentified behaviors in relation to
 her younger sibling, [Greg], in that she has taken on
 the roles and responsibility of caretaker in the home
 due to improper supervision and care.

 d. [Kate] is diagnosed with adjustment disorder and
 she is engaged in recommended weekly therapy.

 e. Respondent mother has not had authorized
 unsupervised contact with [Kate] since custody was
 granted to Respondent father and then to [DSS] due
 to continued safety concerns related to her
 substance use.

 f. While [Kate] was in the placement with [the
 maternal grandmother], there are noted concerns
 regarding Respondent mother having unsupervised
 contact and the extent to which [Kate] was providing
 care for [Greg] who exhibits significant disruptive
 behaviors.

¶ 24 Regarding Greg, the trial court found:

 82. [Greg] was impaired and at a substantial risk of
 impairment as a result of Respondent mother’s neglect.
 Specifically, this court finds [the] following facts:

 a. This court references and fully incorporates
 Findings of Fact numbers 1 through 81 and subparts
 set forth above as if set forth fully below as findings
 of fact.
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

 b. Respondent mother’s continued drug abuse, her
 failure to maintain a safe and stable home, and her
 failure to assure that [Greg] receives necessary care
 and supervision subjects [Greg] to the risks of
 physical and emotional harm and creates an
 environment injurious to h[is] welfare.

 c. [Greg] has exhibited difficulty in regulating his
 behaviors since [DSS] was awarded custody,
 including during placement with [the] maternal
 grandmother . . . , in his current foster home
 placement as well as daycare and school.

 d. [Greg’s] behaviors include not listening to
 directions, temper tantrums, problematic or lack of
 nighttime routine, sleep disturbance, and hitting.

 e. [Greg] is diagnosed with adjustment disorder and
 he displays PTSD symptom[s]. He is engaged in
 recommended weekly individual therapy.

 f. [Greg] had a recent psychiatric evaluation which
 recommended psychotropic medications to assist
 with his sleep. Lack of sleep has a corresponding
 negative impact on his behaviors.

 g. On July 24, 2020, Respondent mother participated
 in a virtual meeting with UNC Psychiatry to discuss
 the recommendation of using psychotropic
 medication coupled with therapy to assist in
 managing [Greg’s] behaviors and sleep disturbance.
 Respondent mother withheld consent for
 medication.

¶ 25 Respondent-mother contends that the foregoing findings of fact constitute

 “purported and speculated impairments or risks of impairment” to the children which

 were unsupported by the evidence and insufficient to support neglect. She also
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

 challenges the portions of findings regarding the children’s difficulty in regulating

 behavior, the children’s diagnoses of adjustment disorder, and Kate’s “parentified”

 behaviors, arguing that the evidence on these issues were presented at the disposition

 stage, not at the adjudication stage. A review of the record establishes that these

 arguments are without merit.

¶ 26 During the adjudicatory phase of the termination hearing, a DSS social worker

 testified that respondent-mother’s multiple positive drug screens are what concerned

 DSS and caused the need for supervised contact with the children and that DSS was

 greatly concerned when respondent-mother transported the children unsupervised in

 January 2020. The DSS social worker also testified that during the time the children

 were placed in the home of their maternal grandmother and respondent-mother, they

 had “some behavioral needs.” Kate exhibited “internalizing behaviors” such as “not

 wanting to show or to talk about her emotions, not feeling comfortable when she is

 feeling something, potentially withdrawing.” She was diagnosed with adjustment

 disorder. The DSS social worker testified that Kate took on a parent role towards

 Greg and that it was concerning “because parentification of children is typically

 they’re trying to fill a role for their parents [that] are not able or not willing to provide

 for their siblings.”

¶ 27 The DSS social worker further testified that Greg had more “external

 behaviors” by engaging in outbursts, tantrums, failing to listen, and “choosing to do
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

 his own task instead of what has been asked.” After the children were placed in their

 foster home, “some of their behaviors became—like come to the forefront again,

 particularly for [Greg] in terms of the not listening.” His behaviors “escalated” and

 included difficulty sleeping and hitting classmates or the foster mother. Greg

 underwent an assessment at UNC Psychiatry and was diagnosed with adjustment

 disorder and post-traumatic stress disorder. Medication to address Greg’s difficulty

 sleeping was recommended, but respondent-mother did not consent to treatment.

 Thus, finding of fact 83c, d, and f of the order terminating respondent-mother’s

 parental rights in Kate and finding of fact 82c, d, e, f, and g of the order terminating

 respondent-mother’s parental rights in Greg are supported by clear, cogent, and

 convincing evidence.

¶ 28 Respondent-mother also argues that there was no evidence she failed to

 maintain a safe and stable home, and that from April 2019 until the termination

 hearings in August and September of 2020, there was no evidence she failed to

 provide necessary care or supervision subjecting either child to the risks of physical

 or emotional harm or created an environment injurious to their welfare. We disagree.

 Unchallenged findings of fact establish that while the children were placed in the

 maternal grandmother’s home where respondent-mother also resided, respondent-

 mother was ordered to only have supervised contact with the children. DSS learned

 that on 11 July 2019, Greg stayed home with respondent-mother unsupervised, and
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

on 5 January 2020, respondent-mother drove the children unsupervised and without

a valid driver’s license. Thereafter, on 9 January 2020, the children were placed in a

licensed foster home due to continued safety and supervision concerns in the

maternal grandmother’s home and lack of evidence of respondent-mother’s sustained

sobriety. Furthermore, respondent-mother moved out of the maternal grandmother’s

home after the children were placed in foster care and failed to be forthcoming about

this residence. The trial court reasonably inferred from these unchallenged findings

that the children were subjected to the risks of physical and emotional harm and that

respondent-mother’s drug use, failure to maintain a safe and stable home, and failure

to assure the children received necessary care and supervision created an

environment injurious to their welfare. See In re D.L.W., 368 N.C. 385, 843 (2016)

(stating that it is the trial judge’s duty to consider all the evidence, pass upon the

credibility of the witnesses, and determine the reasonable inferences to be drawn

therefrom). Moreover, the trial court also made the reasonable inference that

respondent-mother failed to understand or take seriously DSS’s safety concerns of

the children being unsupervised in her care while she continued to abuse illegal

substances. See id. Accordingly, the trial court’s findings of fact 82 and 83b in the

order terminating respondent-mother’s parental rights in Kate and findings of fact

81 and 82b in the order terminating respondent-mother’s parental rights in Greg are

supported by clear, cogent, and convincing evidence.
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

¶ 29 Next, respondent-mother challenges the trial court’s determination that there

 existed a likelihood of a repetition of neglect if the children were returned to her care.

 She contends that the trial court failed to consider and address changed

 circumstances, pointing to the fact that she provided daily care for the children while

 they were placed in the maternal grandmother’s home, there had been no domestic

 violence incidents involving respondent-mother since 2015, and she consistently

 visited the children and brought them toys after they were placed in foster care. We

 are not convinced.

¶ 30 As an initial matter, it is well established that the “trial court need not make

 a finding as to every fact which arises from the evidence; rather, the court need only

 find those facts which are material to the resolution of the dispute.” Witherow v.

 Witherow, 99 N.C. App. 61, 63 (1990), aff’d per curiam, 328 N.C. 324 (1991). As

 previously stated, respondent-mother’s failure to make progress in completing a case

 plan is indicative of a likelihood of future neglect. In re M.A., 374 N.C. at 870. The

 trial court’s unchallenged findings of fact reflect that respondent-mother had not

 adequately made progress in completing her case plan at the time of the termination

 hearing. After DSS obtained custody of the children in April 2019, she agreed to

 complete an updated mental health and substance abuse assessment and follow all

 recommendations, to comply with random drug screens including urine, hair and/or

 nail screens, and to be screened for potential participation in FDTC. However, by the
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

 time of the termination hearing, she had not consistently engaged in mental health

 treatment, was not engaged in substance abuse treatment, continued to deny she had

 substance abuse issues, failed to follow substance abuse treatment and mental health

 recommendations, and tested positive or failed to comply with numerous random

 drug screens. Based on the foregoing, the trial court properly determined that

 respondent-mother neglected the children, and there was a likelihood of future

 neglect if Kate and Greg were returned to respondent-mother’s care. Because the

 existence of a single ground for termination suffices to support the termination of a

 parent’s parental rights in a child, see In re A.R.A., 373 N.C. 190, 194 (2019), we need

 not address whether the trial court erred in terminating respondent’s parental rights

 pursuant to N.C.G.S. § 7B-1111(a)(2).

 B. Respondent-father’s Appeal

¶ 31 Respondent-father’s sole argument on appeal is that the trial court abused its

 discretion in determining that it was in Kate and Greg’s best interests that his

 parental rights be terminated. Specifically, he contends that he had a strong bond

 with his children, and Greg’s behaviors made adoption unlikely. Based on the reasons

 stated herein, we conclude the trial court did not abuse its discretion in determining

 that terminating respondent’s parental rights was in the best interests of the

 children.
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

¶ 32 “If [the trial court] determines that one or more grounds listed in section 7B-

 1111 are present, the court proceeds to the dispositional stage, at which the court

 must consider whether it is in the best interests of the juvenile to terminate parental

 rights.” In re D.L.W., 368 N.C. at 842 (citing In re Young, 346 N.C. 244, 247 (1997);

 N.C.G.S. § 7B-1110). Unchallenged dispositional findings are binding on appeal. In

 re Z.L.W., 372 N.C. at 437. A trial court’s best interests determination “is reviewed

 solely for abuse of discretion.” In re A.U.D., 373 N.C. at 6 (citing In re D.L.W., 368

 N.C. at 842).

¶ 33 In determining whether termination of parental rights is in the best interests

 of a juvenile:

 The court may consider any evidence, including hearsay
 evidence as defined in [N.C.]G.S. 8C-1, Rule 801, that the
 court finds to be relevant, reliable, and necessary to
 determine the best interests of the juvenile. In each case,
 the court shall consider the following criteria and make
 written findings regarding the following that are relevant:

 (1) The age of the juvenile.

 (2) The likelihood of adoption of the juvenile.

 (3) Whether the termination of parental rights will aid in
 the accomplishment of the permanent plan for the
 juvenile.

 (4) The bond between the juvenile and the parent.

 (5) The quality of the relationship between the juvenile and
 the proposed adoptive parent, guardian, custodian, or
 other permanent placement.
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

 (6) Any relevant consideration.

 N.C.G.S. § 7B-1110(a) (2019).

¶ 34 In the instant case, the trial court made the following findings about Kate

 concerning the factors set forth in N.C.G.S. § 7B-1110(a):

 105. [Kate’s] age is seven (7). Her age is not a barrier to
 adoption.

 106. Termination of Respondent father’s parental rights is
 necessary to implement [Kate’s] primary permanent plan
 of adoption. Adoption offers [Kate] the highest level of
 security and legal permanence.

 107. Termination of parental rights [is] the only barrier to
 the adoption of [Kate] and this barrier be [sic] overcome in
 a reasonable period of time by entry of this order.

 108. The likelihood of adoption is high. [Kate] is placed in
 a licensed foster home with [Greg]. The foster parents have
 expressed a willingness to adopt [Kate] while also
 recognizing the strong bond [Kate] has with [Greg].

 109. While [Kate’s] behaviors related to adjustment
 disorder and adjustment disorder can be managed by the
 foster parents through individual therapy and parenting
 strategies, [Greg] exhibits behaviors for which medication
 has been recommended, but not yet started due to lack of
 consent.

 110. The foster parents are interested in adopting [Kate
 and Greg] as a sibling group; however, they want to ensure
 that they can manage [Greg’s] needs. They are optimistic
 in following treatment recommendations, including
 psychotropic medication, for [Greg] to allow for both
 [children] to be adopted.
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

 111. In the event the current foster parents do not adopt
 [Kate], her likelihood of adoption is still high due to her
 age, resilience, engagement in services, and overall
 positive disposition. Locating another adoptive family is
 not a barrier to her adoption.

 112. [Kate] and Respondent father exhibit a strong parent-
 child bond at visits. They greet each other with big smiles
 and hugs. She engages well with him at visits, although at
 times, Respondent father has struggled to interact during
 visits. [Kate] is able to end visits without issue.

 113. [Kate] has a positive, caring relationship with her
 foster parents who are a proposed adoptive placement. The
 foster parents have a six-year old son with whom she has a
 sibling relationship. The foster home is child-friendly and
 centered, and [Kate] is encouraged to take advantage of
 being a child by playing outside or in her room instead of
 feeling responsibility for supervision of the juvenile. She
 feels safe and secure in this placement.

¶ 35 In a separate order, the trial court made the following findings about Greg

 concerning the factors set forth in N.C.G.S. § 7B-1110(a):

 105. [Greg] is age five (5). His age is not a barrier to
 adoption.

 106. Termination of Respondent father’s parental rights is
 necessary to implement [Greg’s] primary permanent plan
 of adoption. Adoption offers [Greg] the highest level of
 security and legal permanence.

 107. Termination of parental rights [is] the only barrier to
 the adoption of [Greg] and this barrier be [sic] overcome in
 a reasonable period of time by entry of this order.

 108. The likelihood of adoption is significant. [Greg] is
 placed in a licensed foster home with [Kate]. The foster
 parents recognize the strong bond [Greg] has with [Kate],
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

and they would like to adopt them as a sibling group.

109. [Greg] has displayed concerning behaviors in the
foster placement related to his diagnosis of adjustment
disorder and corresponding display of PTSD symptoms.
The foster parents and current proposed adoptive
placement have been working with [Greg’s] therapist to
learn strategies to modify [Greg’s] behaviors, including
positive reinforcement and a behavior chart.

110. While these strategies have been helpful, UNC
Psychiatry has recommended [Greg] take medications to
help with his sleep disturbance which correlates to his
negative behaviors. While Respondent father eventually
consented to the recommended regime on August 10, 2020,
Respondent mother did not consent to the medication.

111. The foster parents are interested in adopting [Greg
and Kate] as a sibling group; however, they want to ensure
that they can manage [Greg’s] needs. They are optimistic
in following treatment recommendations, including the use
[of] psychotropic medication in addition to therapy to
address [Greg’s] behaviors to be stabilized.

112. [Greg] is in need of permanency and this uncertainty
has a negative impact on his therapeutic needs.
Termination of parental rights would allow for adoption to
be pursued to allow for a secure, stable placement.

113. In the event the current foster parents do not adopt
[Greg], his likelihood of adoption is still high due to his age,
engagement in therapeutic services, and positive
improvement based on routine and proper supervision.
Locating another adoptive family is not a barrier to his
adoption due to his age and positive demeanor of [Kate]
with whom he shares a special bond.

114. [Greg] and Respondent father exhibit a strong parent-
child bond at visits. They greet each other with big smiles
and hugs. [Greg] engages well with him at visits, although
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

 at times, Respondent father has struggled to interact
 during visits. [Greg] had difficulty separating at some of
 the initial visits, but he is currently able to end visits
 without issue and he does not ask about him between the
 visits.

 115. [Greg] has a positive, caring relationship with his
 foster parents who are a proposed adoptive placement. The
 foster parents have a six-year old son with whom he has a
 sibling relationship. This relationship has been strained
 due to [Greg’s] behaviors; however, there is encouragement
 from his providers that medication will assist in addressing
 these negative behaviors and improve the relationship
 with all family members. The foster home is child-friendly
 and centered, and [Greg] is encouraged to take advantage
 of being a child by playing outside or in [h]is room. The
 foster parents provide [Greg] a safe and secure placement
 to allow him the time to adjust to the many transitions in
 his young life.

¶ 36 First, respondent-father argues the trial court erred in finding that

 termination of his parental rights was the only barrier to adoption. Yet, the record

 evidence clearly supports this finding. A DSS social worker testified that adoption

 had been identified as the children’s primary permanent plan, and the “only” barriers

 to achieving that permanent plan were respondents’ parental rights. Thus, finding of

 fact 107 in both orders terminating respondent-father’s parental rights in the

 children is supported by the evidence.

¶ 37 Second, respondent-father contends that Greg’s behaviors made the likelihood

 of adoption unlikely and that the trial court’s finding that the likelihood of Greg’s

 adoption is “significant” contradicts its later finding that in the event his current
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

 foster parents do not adopt him, his likelihood of adoption “is still high[.]” We do not

 find the trial court’s use of the term “significant” and “high” in reference to the

 likelihood of Greg’s adoption to be contradictory or inconsistent. A DSS social worker

 testified that Greg’s current foster placement was open to adoption, and although

 Greg’s behavioral issues and need for continued treatment constituted barriers, the

 foster parents were “willing to keep trying to address the behaviors to make sure they

 can meet [Greg’s] needs.” The DSS social worker further testified that the foster

 parents wanted to follow “the recommendations of [Greg’s] treating physicians at

 UNC Psychiatry and the need for medication[.]” A guardian ad litem court report also

 indicates that “[w]ith the implementation of the therapeutic plan[,] the likelihood of

 finding an adoptive home [for Greg] is good.” Thus, we do not find respondent-father’s

 arguments compelling.

¶ 38 Third, respondent-father asserts that the trial court failed to acknowledge that

 the likelihood of implementing Kate’s permanent plan of adoption was connected to

 the marked improvement of Greg’s mental health and behavioral status. We disagree

 with this assessment. In finding of fact 110 of the order terminating respondent-

 father’s parental rights in Kate and 111 of the order terminating respondent-father’s

 parental rights in Greg, the trial court found that while the foster parents were

 interested in adopting the children “as a sibling group,” they wanted to “ensure that

 they can manage [Greg’s] needs.” The trial court also found that the foster parents
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

 were optimistic in following treatment recommendations to stabilize Greg’s

 behaviors. These findings reflect the trial court’s recognition that Kate’s adoptability

 was related to the treatment of Greg’s behaviors and the foster parents’ ability to

 manage his needs. Respondent-father further asserts that the trial court erred in

 finding that it was highly likely that Kate would be adopted, but this finding is

 supported by the guardian ad litem’s court report, which states that “[t]here are no

 known barriers which would make it difficult [for Kate] to find an adoptive home.”

¶ 39 Fourth, respondent-father argues that the children’s bond with the foster

 parents “paled in comparison” to the bond they shared with respondent-father. He

 directs the Court’s attention to the fact that he regularly talked on the phone and saw

 his children during visitation, the children were excited to see him and show him

 affection, the children were sad to see him leave, and he brought them food and toys

 at visits. He asserts that the trial court paid “little attention” to the lack of bond the

 children had with the foster parents to justify terminating his parental rights. We do

 not agree with respondent-father’s contentions. The trial court’s findings of fact 112

 and 113 in the order terminating respondent-father’s parental rights in Kate and

 findings of fact 114 and 115 in its order terminating respondent-father’s parental

 rights in Greg reflect the trial court’s consideration of the children’s “strong parent-

 child bond” with respondent-father, as well as the children’s “positive, caring

 relationship with their foster parents[.]” The bond between respondent-father and his
 IN RE K.B. & G.B.

 2021-NCSC-108

 Opinion of the Court

 children is just one of the factors to be considered under N.C.G.S. § 7B-1110(a), and

 “the trial court is permitted to give greater weight to other factors.” In re Z.L.W., 372

 N.C. 432, 437 (2019).

¶ 40 The trial court’s findings demonstrate that it considered the dispositional

 factors set forth in N.C.G.S. § 7B-1110(a) and “performed a reasoned analysis

 weighing those factors.” In re Z.A.M., 374 N.C. at 101. “Because the trial court made

 sufficient dispositional findings and performed the proper analysis of the

 dispositional factors,” id., we conclude that the trial court did not abuse its discretion

 in concluding that termination of respondent-father’s parental rights was in Kate and

 Greg’s best interests. Accordingly, we affirm the trial court’s order terminating

 respondent-father’s parental rights in Kate and Greg.

 III. Conclusion

¶ 41 The trial court did not err in concluding that grounds existed to terminate

 respondent-mother’s parental rights in Kate and Greg pursuant to N.C.G.S. § 7B-

 1111(a)(1). The trial court did not abuse its discretion in concluding that it was in

 Kate and Greg’s best interests that respondent-father’s parental rights be

 terminated. Accordingly, we affirm the trial court’s orders terminating respondents’

 parental rights in Kate and Greg.

 AFFIRMED.