IN THE SUPREME COURT OF NORTH CAROLINA

No. 108PA24

Filed 23 May 2025

IN THE MATTER OF: L.C.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 293 N.C. App. 380, 900 S.E.2d 697 (2024), vacating and remanding an adjudication order entered on 5 January 2023 by Judge Donna F. Forga in District Court, Swain County. Heard in the Supreme Court on 16 April 2025.

> *Crystal Louise Bryson for petitioner-appellant Swain County Department of Social Services.*
>
> *Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Sam J. Ervin IV, for appellant Guardian ad Litem.*
>
> *Wendy C. Sotolongo, Parent Defender, by Annick Lenoir-Peek, Deputy Parent Defender, for respondent-appellee mother.*

NEWBY, Chief Justice.

In this case we decide whether the Court of Appeals erred by vacating and remanding the trial court's order adjudicating two-year-old L.C. (Layla) as a neglected juvenile.[1] The Court of Appeals concluded that remand was necessary because the trial court's order lacked specific factual findings about how respondent, Layla's mother, had impaired or substantially risked impairing her daughter's

---

[1] We refer to the minor child by a pseudonym to protect her identity and for ease of reading. *See* N.C. R. App. P. 42(b).

welfare. Although a trial court's written findings of fact must sufficiently support its conclusions of law, the trial court does not need to specifically find a substantial risk of impairment in order to conclude that a child is neglected. The order's findings here—which detailed facts including respondent's continued drug abuse and her failure to follow the safety plan she had signed just two days earlier—sufficiently support a conclusion of neglect. We therefore reverse the decision of the Court of Appeals.

Respondent gave birth to Layla in August 2019. Layla's biological father is unknown, and respondent's "live-in girlfriend" is listed on Layla's birth certificate in place of the father.[2] Prior to the events of this case, Layla resided with respondent and respondent's girlfriend. While respondent and her girlfriend were Layla's primary caretakers, the girlfriend's mother would occasionally help care for the child as well.

Respondent has a lengthy history of alcohol and illegal drug abuse. At the time of Layla's birth, both respondent and Layla tested positive for methamphetamine and THC. Respondent also admitted to using both marijuana and unprescribed Valium on the same day she gave birth to her twin children, born about two years after

---

[2] The Court of Appeals held that the girlfriend was not entitled to appeal the trial court's adjudication order because she was not Layla's parent, guardian, or custodian. *In re L.C.*, 293 N.C. App. 380, 383–89, 900 S.E.2d 697, 702–06 (2024). *See generally* N.C.G.S. § 7B-1002(4) (2023) ("Appeal . . . may be taken by . . . . [a] parent, a guardian . . . or a custodian . . . ."). The parties did not challenge this ruling in their arguments to this Court.

Layla.[3] The twins remained in the neo-natal intensive care unit for two weeks; one of them was hospitalized for more than a month. Respondent denied that the twins' hospitalizations resulted from drug withdrawals.

In response to the circumstances of the twins' births, a social worker with the Swain County Department of Social Services (DSS) visited respondent's home to check on Layla's wellbeing. The social worker recalled that respondent spoke "very erratically," "mov[ed] her arms a lot," and had difficulty remaining on topic, which caused the social worker to believe respondent was under the influence at the time of their meeting. Respondent told the social worker that she used methamphetamine, heroin, marijuana, benzodiazepines, and other drugs for which she claimed to have prescriptions. Respondent also stated that the home was infested with rats and said that Layla had been exposed to drugs through "spore to spore contact."[4] When the social worker suggested that Layla receive drug testing, respondent declined, asserting that "Swain DSS is only good for breaking up families."

Subsequent interactions between the social worker and respondent turned hostile, with respondent becoming "very aggressive" and demanding that the social worker leave the home. Respondent and her girlfriend eventually signed a temporary

---

[3] Respondent relinquished her parental rights over the twins. They are not part of this appeal.

[4] In the adjudication order, the trial court stated that it "ha[d] no information or knowledge of what ['spore to spore'] mean[t]." The social worker herself believed respondent meant "skin to skin" or "pore to pore" contact.

safety plan, under which neither respondent nor her girlfriend were permitted to "have any unsupervised contact" with Layla. Instead, the plan assigned the girlfriend's mother as Layla's primary caretaker. Yet just a few days after the plan's implementation, the same social worker encountered respondent, the girlfriend, and Layla—without the girlfriend's mother and thus unsupervised—at the Bryson City Federal Building. The discovery of this violation of the recent safety plan led DSS to take Layla into temporary custody. DSS then filed a petition in District Court, Swain County, alleging that Layla was a neglected and dependent juvenile.

After receiving testimony at an adjudication hearing on 7 December 2022, the trial court entered an order concluding that Layla was a neglected juvenile. The trial court's order detailed the facts above and also found, in relevant part:

> 3. That there have been multiple prior encounters between DSS and [respondent] involving [Layla]. One prior occurrence was in December of 2020. At that time a social worker went to [respondent's] home with an allegation that the minor child had grabbed a needle and that [respondent] was selling drugs out of a bathroom window.
>
> 4. That [respondent] reports that the needle was a tattoo needle and [that DSS] instructed [her] to put it in a lock box.
>
> . . . .
>
> 15. That on or about [15 November] 2021[,] the social worker found [respondent], [Layla], and [respondent's girlfriend] at the [Bryson City Federal Building] without a suitable supervisor. At that time the social worker made the decision to assume [twelve-]hour custody of the child.
>
> 16. That [respondent] left the child and was gone for

-4-

approximately two hours. When she returned she had a stroller, three outfits[,] and a couple of toys for the child.

17. That [respondent and her girlfriend] refused to sign a [second] temporary safety plan with [the original] social worker . . . but did finally sign when . . . a [second] social worker[ ] arrived.

18. That [respondent] testified that she could not remember much after [Layla] was taken from her because she drank a lot of [whiskey] to the point that she was blacking out and found herself in the bathtub without knowledge of how she got there.

19. That during at least one interaction with the social worker, [respondent] was irate, threatened . . . a relative of [the girlfriend], and admitted to a willingness to threaten [the girlfriend's relative].

20. That [respondent] refused to supply to the court information regarding where she had obtained the [V]alium that she took.[5]

21. That [respondent] had previously testified that when she left [Layla] with the [girlfriend] and social worker and walked from the [Bryson City] Federal Building to her home (a mile away), she had ingested methamphetamine during her time away from [Layla].

22. That there is uncontroverted evidence that [respondent] has struggled with substance abuse during [Layla]'s entire lifetime, including being a recovering heroin addict.

23. That [respondent] could not convey to the court any clear timeline as to how long [Layla]'s siblings were in the NICU after their birth[s].

2[4]. That the Swain County Department of Social Services has made reasonable efforts to prevent or eliminate the need for placement of the juvenile, to reunify

---

[5] The trial court held respondent in contempt of court for this behavior.

the juvenile following placement[,] and to enact a permanent plan on behalf of the juvenile. Some of those reasonable efforts are entering into a safety plan with [respondent and her girlfriend], attempting a temporary safety placement for the juvenile, performing a CPS investigation, and taking temporary custody of the juvenile.

2[5]. That it is contrary to the best interest of the juvenile to return to the home of [respondent] at this time.

Accordingly, the trial court concluded as a matter of law that Layla was a neglected juvenile.

Respondent appealed the trial court's adjudication order and an additional, subsequent disposition order to the Court of Appeals.[6] The Court of Appeals unanimously held that the trial court's factual findings lacked the requisite specificity to support its conclusion of neglect. *See In re L.C.*, 293 N.C. App. 380, 394–401, 900 S.E.2d 697, 709–13 (2024). The court directly acknowledged our decision in *In re G.C.*, 384 N.C. 62, 884 S.E.2d 658 (2023), and quoted its substantive holding: "[A]lthough 'there is no requirement of a specific written finding of a substantial risk of impairment[,] . . . the trial court must make written findings of fact sufficient to support its conclusion of law of neglect.'" *In re L.C.*, 293 N.C. App. at 394, 900 S.E.2d at 709 (quoting *In re G.C.*, 384 N.C. at 69, 884 S.E.2d at 663). The Court of Appeals nonetheless vacated the order and remanded for "additional findings of fact . . . address[ing] whether and how [respondent's actions] have harmed Layla or

---

[6] The disposition order is not before this Court.

have placed her at a substantial risk of harm." *Id.* at 401, 900 S.E.2d at 713. Following the decision, DSS and the guardian ad litem jointly filed a petition for discretionary review with this Court, which we allowed.

"An appellate court reviews a trial court's adjudication to determine whether the findings are supported by clear, cogent[,] and convincing evidence and the findings support the conclusions of law." *In re G.C.*, 384 N.C. at 65, 884 S.E.2d at 661 (quoting *In re K.S.*, 380 N.C. 60, 64, 868 S.E.2d 1, 4 (2022)). "Where no [objection is made] to a finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding on appeal." *Id.* at 66, 884 S.E.2d at 661 (alteration in original) (quoting *In re K.S.*, 380 N.C. at 64, 868 S.E.2d at 4). The trial court's adjudication of Layla as a neglected juvenile receives de novo review because it is a conclusion of law. *See id.* To apply de novo review in this context, we use the trial court's factual findings to draw our own legal conclusions, which we then "freely substitute" for the conclusions of the trial court. *Id.* (quoting *In re T.M.L.*, 377 N.C. 369, 375, 856 S.E.2d 785, 790 (2021)).

We first evaluate the trial court's conclusion that Layla was a neglected juvenile. A minor child is neglected if, *inter alia*, her parent or legal guardian "[d]oes not provide proper care, supervision, or discipline" or "[c]reates or allows to be created a living environment that is injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15) (2023). "In order to adjudicate a juvenile neglected, our courts have additionally required that there be some physical, mental, or emotional impairment of the juvenile

or a substantial risk of such impairment as a consequence of the failure to provide proper care, supervision, or discipline." *In re Stumbo*, 357 N.C. 279, 283, 582 S.E.2d 255, 258 (2003). But "to be clear, there is no requirement of a specific written finding of a substantial risk of impairment." *In re G.C.*, 384 N.C. at 69, 884 S.E.2d at 663.[7] "Rather, the trial court must make written findings of fact sufficient to support its conclusion of law of neglect." *Id.*

*In re G.C.* nonetheless explained that some level of factual specificity is still necessary to conclude that a juvenile is neglected: "The ultimate findings of fact that [the child] does not receive proper care, supervision, or discipline from her parents is supported by the trial court's evidentiary findings of fact and *reached by natural reasoning* from the evidentiary findings of fact." *Id.* at 67, 884 S.E.2d at 662 (emphasis added). The phrase "reached by natural reasoning" means reached logically—in other words, the conclusion at which a reasonable person would arrive after considering all of the trial court's evidentiary findings. Accordingly, the trial court does not need to explicitly connect each of the dots between factual findings and legal conclusions,

---

[7] The statutory text guides our reasoning on this point. As we explained in *In re G.C.*, the statute's definition of neglect—unlike its definition of abuse—does not include a substantial risk requirement. 384 N.C. at 69 n.4, 884 S.E.2d at 663 n.4. *Compare* N.C.G.S. § 7B-101(15) (2023) (defining a "neglected juvenile" in part as one whose parent or guardian "[c]reates or allows to be created a living environment that is injurious to the juvenile's welfare"), *with id.* § 7B-101(1) (defining an "abused juvenile[ ]" in part as one whose parent or guardian "[c]reates or allows to be created *a substantial risk* of serious physical injury to the juvenile by other than accidental means" (emphasis added)). We noted that these textual differences "further indicat[ed] that the legislature did not intend to require a finding of fact of substantial risk of impairment" when adjudicating a neglected juvenile. *In re G.C.*, 384 N.C. at 69 n.4, 884 S.E.2d at 663 n.4.

even though such connections assist appellate review and provide clarity. If the objective reasonable person, examining the totality of the circumstances, would understand how the trial court's written findings lead to its conclusion of neglect, those findings are sufficient.

Using this standard here, we conclude that the trial court's factual findings adequately support its conclusion of neglect. A small sampling of the trial court's findings is sufficient to make this point. Layla was born to a mother with a severe and ongoing addiction to illegal drugs;[8] indeed, the child tested positive at birth for both methamphetamine and THC and respondent admitted to smoking marijuana and using unprescribed drugs *on the same day she gave birth to Layla's siblings*. The home in which Layla, respondent, and respondent's girlfriend lived was—at least according to respondent—infested with rats.[9] Layla had access to unsecured needles

---

[8] A parent's substance abuse alone is not grounds for adjudicating neglect. *In re E.P.*, 183 N.C. App. 301, 304–05, 645 S.E.2d 772, 774, *aff'd per curiam*, 362 N.C. 82, 653 S.E.2d 143 (2007).

[9] The Court of Appeals expressed particular concern with the trial court's factual finding on this point, which stated "[t]hat there was discussion about rats in the building and holes in the walls of [respondent's] home," and that respondent "believed the rats would come out of the holes in the walls and cabinets and try to bite her." *In re L.C.*, 293 N.C. App. at 398–99, 900 S.E.2d at 712. The Court of Appeals concluded that this finding was insufficient because other evidence suggested that respondent's drug use had caused her to hallucinate the rats and that the home was in no real danger of rodent infestation. *Id.* at 399, 900 S.E.2d at 712. According to the Court of Appeals, the trial court should have specified whether it believed the rats actually existed or were just a hallucination, as well as the kind of impairment to Layla—physical, mental, or emotional—that would have resulted. *Id.*

But a trial court does not need to specify whether the impairment in question is physical, mental, or emotional. *See In re Stumbo*, 357 N.C. at 283, 582 S.E.2d at 258 (listing the three kinds of impairments). Instead, the trial court merely needs to conclude the

that respondent claimed were for "tattooing," despite the fact that respondent did not have a tattoo license. Respondent continues to struggle with substance abuse, admitting to the trial court that she uses combinations of illegal drugs, unprescribed prescription drugs, and alcohol to the point of "blacking out . . . in the bathtub without knowledge of how she got there." Respondent was uncooperative with DSS when the department proposed both drug testing Layla and entering into a safety plan. When respondent eventually signed the plan, a social worker observed her violating it just two days later. Considering the totality of these evidentiary findings, the trial court reasonably concluded that Layla was a neglected juvenile because she lacked proper care, supervision, or discipline and lived in an environment injurious to her welfare. Thus, the Court of Appeals erred in vacating the trial court's order.

---

existence of impairment (or a substantial risk thereof) based on a reasonable interpretation of the evidentiary findings.

Here the Court of Appeals unnecessarily distinguished between the physical impairment caused by actual rats and the mental impairment caused by respondent's hallucinations of rats. "Either possibility could indicate a risk of substantial harm to the child," as the Court of Appeals itself recognized. *In re L.C.*, 293 N.C. App. at 399, 900 S.E.2d at 712. Under *In re G.C.*, a reasonable person would understand that Layla faced a significant risk of impairment regardless of whether the rats were real or imaginary. Moreover, impairments do not always fall neatly into one of the three categories. For example, if respondent were indeed hallucinating the rats, she "may be unable to care for [her] child due to her mental impairment." *In re L.C.*, 293 N.C. App. at 399, 900 S.E.2d at 712. The same hallucinations, however, could also create a physical impairment—for instance, in the event that respondent began using weapons in the home to repel her hallucinations or started hallucinating that *Layla herself* was a threat. Although the three types of impairments help us better understand the term's meaning, the trial court does not need to expressly place a given impairment within these rough categories. The trial court did not err here.

We close by addressing the trial court's decision to recite some of the evidence in its findings of fact without stating whether it found that evidence credible. For example, Finding of Fact 6 reads, "[Respondent] testified to using controlled substances including . . . [V]alium and smoking marijuana regularly prior to the birth of her twins ([Layla]'s siblings)." The Court of Appeals correctly recognized that the trial court is required to "resolv[e] any material disputes" when making findings of fact. *In re L.C.*, 293 N.C. App. at 396, 900 S.E.2d at 710 (quoting *In re C.L.C.*, 171 N.C. App. 438, 446, 615 S.E.2d 704, 708 (2005), *aff'd per curiam in part and disc. rev. improvidently allowed in part*, 360 N.C. 475, 628 S.E.2d 760 (2006)). But when the recited evidence is a statement against interest, like respondent's testimony in Finding of Fact 6, we may assume that the trial court found it credible without the trial court expressly characterizing it as such. *Cf.* N.C.G.S. § 8C-1, Rule 804(b)(3) (2023) ("A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."). Because a reasonable woman would not admit to using illegal drugs during her pregnancy unless she actually had used those drugs, the trial court did not need to state that it found respondent's testimony credible here.[10]

---

[10] Of course, this is a narrow exception to the general rule. The best practice is for the trial court to err on the side of too much detail when making credibility determinations and written findings of fact.

In sum, the Court of Appeals erred by vacating and remanding for specific written findings of impairment. Despite citing *In re G.C.* and quoting its holding, *see In re L.C.*, 293 N.C. App. at 394, 900 S.E.2d at 709, the opinion below proceeded as if our analysis in that case did not exist. The Court of Appeals instead cited several cases about an appellate court's inability "to assume findings of fact the trial court did not make." *Id.* at 395, 900 S.E.2d at 710 (citing *In re A.H.D.*, 287 N.C. App. 548, 564, 883 S.E.2d 492, 504 (2023)). It then relied upon those general principles to conclude that the trial court's findings here were insufficient because they "[did] not address the impact on Layla as required to support an adjudication of neglect." *Id.* at 397, 900 S.E.2d at 711 (citing *In re K.J.B.*, 248 N.C. App. 352, 355, 797 S.E.2d 516, 518–19 (2016)). But as our decision in *In re G.C.* unequivocally stated, "To the extent any Court of Appeals' decision requires a written finding of fact by the trial court of substantial risk of impairment, *such decisions are overruled.*" *In re G.C.*, 384 N.C. at 69 n.5, 884 S.E.2d at 663 n.5 (emphasis added).

Because the trial court's findings sufficiently supported its conclusion that Layla was a neglected juvenile, the Court of Appeals should have affirmed the adjudication order. The decision of the Court of Appeals is reversed.

REVERSED.

Justice RIGGS dissenting.

The crux of the issue is whether this Court in *In re G.C.*, 384 N.C. 62 (2023), disclaimed the necessity for impairment-related findings. While we emphasized in *In re G.C.* that an adjudication can be justified if "[t]he ultimate finding[ ] of fact that [a child is neglected] is supported by the trial court's evidentiary findings of fact and reached by natural reasoning from the evidentiary findings of fact," 384 N.C. at 67, I do not read that case as completely destroying any requirement under the statutes that a trial court "show its work" before adjudicating a child to be neglected. Indeed, we confirmed that the trial court's assessment that there is "some physical, mental, or emotional impairment *of the juvenile* or a substantial risk of such impairment as a consequence of the failure to provide proper care, supervision, or discipline" "remains useful and remains the law." *Id.* at 69 (cleaned up) (emphasis added). We then proceeded to ascertain the extent to which a showing of impairment is sufficient for the purpose of finding neglect.

In *In re G.C.*, we clarified that while "there is no requirement of a specific written finding of a substantial risk of impairment," a trial court must nevertheless "make written findings of fact sufficient to support its conclusion of law of neglect." *Id.* When we pair this with our affirmation in the same opinion that there "must be some physical, mental, or emotional impairment" and that this requirement "remains

the law," *id.*, only one relevant inference can be drawn: if the trial court does not make a specific written finding of impairment, then it must make findings of fact sufficient to demonstrate impairment. The Court of Appeals vacated the trial court's order and remanded for further proceedings based on a reading of *In re G.C.* that matches my own: a required demonstration that when the petition was filed, Layla suffered some physical, mental, or emotional impairment or a substantial risk of such impairment because of respondent-mother's failure to provide proper care, supervision, or discipline. *In re L.C.*, 293 N.C. App. 380, 400–01 (2024).

The majority focuses its discussion of *In re G.C.* on the ultimate conclusion "that [the child, Glenda,] does not receive proper care, supervision, or discipline from her parents," which was "supported by the trial court's evidentiary findings of fact and reached by natural reasoning from the evidentiary findings of fact." *In re G.C.*, 384 N.C. at 67. However, we also went on to describe what those findings were:

> Specifically, Glenda lived in the same residence as Glenda's mother, respondent, and Gary. Respondent provided care and supervision for Glenda as he had for her brother Gary until his death. Glenda's mother had previously been convicted of misdemeanor child abuse, and her older children had previously been adjudicated abused, neglected, and dependent juveniles for reasons that included Glenda's mother's failure to feed one of the older children.
>
> On 12 March 2020, respondent was at work, and only Glenda's mother was with Gary. That day, Glenda's mother left Gary, who was three months old, in his Pack 'n Play on his side with blankets for over three hours without supervision even though "*sleeping in an environment with blankets while less than one year of age is a risk factor for*

-14-

*an accidental asphyxial event*." When Glenda's mother did finally check on Gary around 7:38 p.m., she found Gary unresponsive. She responded by running to the home of a relative, who was a nurse and lived nearby. Glenda's mother called 911 after the relative instructed her to do so. Gary was pronounced dead by Emergency Medical Services upon arrival at the residence. Emergency Medical Services observed Gary "foaming from the nose and the mouth, indicative of asphyxiation," and the medical examiner could not rule out an asphyxial event given the autopsy findings. Both respondent and Glenda's mother had been instructed about proper sleeping arrangements for children.

Although there is no mention of Glenda, who was approximately one and a half years old at the time, or her whereabouts on 12 March 2020 in the trial court's findings of fact, the foregoing evidentiary findings support the ultimate finding that Glenda does not receive proper care, supervision, or discipline from her parents and the conclusion of law that Glenda is a neglected juvenile.

*Id.* at 67–68. We reiterated that

[i]n determining whether a juvenile is a neglected juvenile, it is *relevant* whether that juvenile lives in a home where another juvenile has died as a result of suspected abuse or neglect or lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home.

*Id.* at 68 (quoting N.C.G.S. § 7B-101(15) (2021)). In Glenda's case, both situations were present. Thus, we concluded that the trial court's findings supported the conclusion that there were "current circumstances that present a risk" to Glenda. *Id.* (quoting *In re J.A.M.*, 372 N.C. 1, 9 (2019)).

The facts here do not map onto the facts in *In re G.C.*, and given the cases' differences, a different result should follow. Here, neither of the situations that

dictated the outcome in *In re G.C.* were present. Therefore, given the lack of an ultimate finding that satisfies the statutory definition of Layla being a neglected juvenile and the lack of findings of fact to suggest that Layla was neglected, the trial court in this case needed to independently find and demonstrate that Layla was neglected. Those findings were required, per our precedent, to support an adjudication of neglect.

Here, many of the trial court's findings, specifically Findings of Fact 6, 7, 8, and 9 provided what Layla's mother testified to or reported to a third party without indicating whether the trial court found those "facts" to be true or that they adopted them as such. Other findings indicated that Layla's mother was unwilling to work with the Department of Social Services (DSS) and that she struggled with substance abuse in the home. However, those findings do not signify whether the substance abuse in the home or the unwillingness to work with DSS had an effect on Layla.

As to Finding of Fact 9, the trial court did not make a finding as to whether Layla was exposed to controlled substances due to "spore to spore" or any other type of contact. Indeed, the trial court itself said it "had no information or knowledge" of what "spore to spore" even meant. Similarly, in Findings of Fact 14 and 15 the trial court found that the safety plan referenced in Finding of Fact 10 was violated and that Layla was found without a suitable supervisor, but it made no finding as to the impact of these findings on Layla.

As for the trial court's Finding of Fact 11, noting the discussion about rats in

the building or holes in the walls, the trial court did not find the home unsuitable or unsafe. While it is true that even if the finding regarding rats may signal hallucinations by Layla's mother, *see In re L.C.*, 293 N.C. App. at 398–99, indicating potential mental impairment that could still support a risk of substantial harm to the child—that is a different finding of fact from a physical risk created by an unsuitable or inhabitable home environment. Further, it is a finding of fact that, as the Court of Appeals recognized, the trial court did not make. *Id.* at 398. And it would certainly strain natural reasoning to conclude from the fact that a discussion happened that Layla's mother was hallucinating. A natural and more straightforward inference might be that the home did suffer from some kind of infestation problem, which would not itself support a legal conclusion that the home was unsafe. Further, DSS's North Carolina Safety Assessment on 12 November 2021, did not note Layla's physical living conditions as "hazardous and immediately threatening to the health and/or safety of the child." It is a trial court's role to make findings to support its legal conclusions, and it is not possible to determine from the adjudication order whether the trial court did so.

The Court of Appeals explained that the trial court did not provide any findings of fact that addressed or could allow the Court of Appeals to reason how Layla suffered impairment or was at substantial risk of impairment. *Id.* at 395–96. The Court of Appeals did not rule out that a particular finding of fact could support the conclusion that Layla was impaired or faced a substantial risk of impairment, but it

emphasized that it is the trial court's job is to make such findings. *Id.* 396–98. The trial court cannot simply "describe testimony" or "infer," and it is not the job of the appellate courts to reweigh the evidence afterwards. *Id.* 396–98, 400. Thus, the Court of Appeals did not err when it vacated the trial court's adjudication order. It simply required the trial court to make findings that support a conclusion that *this child* was neglected and found on de novo review that the trial court failed to make findings sufficient to demonstrate that Layla was subjected to impairment or substantial risk of impairment. *Id.* at 401.

These cases are never easy. Protecting children from abuse, neglect, or dependency is of the utmost importance to promoting the general welfare of our state. And the constitutional rights of parents to raise their children in the ways they choose are also a serious consideration. *See Happel v. Guilford Cnty. Bd. of Educ.*, No. 86PA24, slip op. at 14 (N.C. Mar. 21, 2025) ("This Court affirmed 'the paramount right of parents to custody, care, and nurture of their children' even earlier than the Supreme Court of the United States[,] . . . [and] North Carolina law 'fully recognized' the natural and substantive rights of parents to 'the custody and control of their infant children.' " (first quoting *Petersen v. Rogers*, 337 N.C. 397, 402 (1994); and then quoting *Atkinson v. Downing*, 175 N.C. 244, 246 (1918))). Balancing these considerations requires us to resist the temptation to sacrifice the statutory, procedural requirements set forth by this state in a purported attempt to achieve the former consideration. Even in these sensitive cases, we must identify the limits to

which we must adhere before intervening in the parent-child relationship. *See In re Stumbo*, 357 N.C. 279, 286 (2003) ("While acknowledging the extraordinary importance of protecting children from abuse, neglect, or dependency by prompt and thorough investigations, we likewise acknowledge the limits within which governmental agencies may interfere with or intervene in the parent-child relationship."); *Atkinson*, 175 N.C. at 263 (explaining that government interference is not justified "except when the good of the child clearly requires it"). A court's findings and intervention must be made in recognition that a finding of a parent's neglect of a child within the meaning of neglect under N.C.G.S. § 7B-101 is grounds for later termination of that parent's parental rights. *See* N.C.G.S. § 7B-1111(a)(1) (2023). That is precisely why the General Assembly and our precedent recognize that statutory requirements for what a trial court must consider and explain is more than mere formalism. N.C.G.S. § 7B-100(1) (2023) (stating that one purpose of the abuse, neglect, and dependency subchapter is "[t]o provide procedures for the hearing of juvenile cases that assure fairness and equity and that protect the constitutional rights of juveniles and parents"); *In re Stumbo*, 357 N.C. at 286 ("[S]o long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." (alteration in original) (quoting *Troxel v. Granville*, 530 U.S. 57, 68–69 (2000))); *In re Stumbo*, 357 N.C. at 288 ("By enacting chapter 7B, subchapter

I, the General Assembly has provided a mandate to departments of social services in addressing reports of abuse, neglect, and dependency."). The majority's dismissal of these procedural safeguards for protecting the child-parent relationship as mere "best practice" chips away at any work that the procedural requirements actually do in that safeguarding. *See* majority *supra* note 10.

I do not read *In re G.C.* to have totally eviscerated the requirement that a trial court make findings or have justified in the record the findings that would support a legal conclusion of neglect. *See In re G.C.*, 384 N.C. at 69. A trial court's adjudication of neglect must be "supported by the trial court's evidentiary findings of fact and reached by natural reasoning from the evidentiary findings of fact." *Id.* at 67. "Natural reasoning" means that an adjudication of neglect must be the natural conclusion—i.e., that if appellate courts are faced with interpreting trial court orders that could support multiple conclusions, then the trial court has not satisfactorily shown their work in their findings and conclusions. Our General Assembly set forth, in N.C.G.S. § 7B-101(15), what must be established for a child to be adjudicated neglected, and longstanding case law requires that this showing be more than performative. Because I believe the majority's interpretation continues to chip away at these safeguards that recognize the importance of the child-parent relationship, I respectfully dissent.